William CAULFIELD et al., Appellants,

v.

The BOARD OF EDUCATION OF the
CITY OF NEW YORK et
al., Appellees.

Nos. 1144 to 1149, Dockets 78–6035,
78–6044, 78–6058, 78–6066, 78–6080
78–6081 and 6141.

United States Court of Appeals,
Second Circuit.

Argued June 19, 1978.

Decided Sept. 5, 1978.

Leonard Greenwald, New York City (Gretchen White Oberman, Lewis, Greenwald & Oberman, New York City, of counsel), for intervenor-appellant-cross-appellee.

Jessica D. Silver, Washington, D. C. (Drew S. Days, III, Asst. Atty. Gen. of the United States, Brian K. Landsberg, Cynthia L. Attwood, Dept. of Justice, Washington, D. C., David G. Trager, U. S. Atty. for the Eastern District of New York, Richard P. Caro, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee-cross-appellant.

Arthur Eisenberg, New York City (E. Richard Larson, Carol L. Ziegler, New York Civil Liberties Union, Robert H. Hermann, M. L. Taracido, Puerto Rican Legal Defense and Education Fund, Inc., New York City, of counsel), for appellee-cross-appellant.

Doron Gopstein, Asst. Corp. Counsel (Allen G. Schwartz, Corp. Counsel of the City of New York, New York City, of counsel), for appellee New York City.

Nathaniel R. Jones, James I. Meyerson, New York City, Coalition of Concerned Black Educators, for intervenor-appellees-cross-appellants.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and PIERCE, District Judge.*

OAKES, Circuit Judge:

On this consolidated appeal, the parties challenge two separate orders of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge. The first is an order of February 24, 1978, denying the motion of plaintiffs-appellants (appellants) who are New York City teachers, principals, community school board officials and parent-teacher association officials, for a preliminary injunction to prevent city, state and federal officials, defendants-appellees (appellees), from collecting data on the ethnic identification of teachers and supervisors. Appellants appeal the denial of the preliminary injunction against data collection. In the second order, dated March 15, 1978, Judge Weinstein sua sponte remanded the case to the Department of Health, Education & Wel-

Morris Weisberg, New York City (Harold F. Hay, New York City, of counsel), for appellant-cross-appellee.

* Of the Southern District of New York, sitting by designation.

fare (HEW) for further administrative proceedings to afford appellants and other interested persons the opportunity to participate in the administrative proceeding. The federal appellees have cross-appealed from the order remanding the proceedings to HEW.

With respect to the order denying the injunction against data collection, we hold that the district court did not abuse its discretion in refusing to halt the collection of ethnic data on teachers and supervisors. We further hold that in its second order the district court erroneously remanded the case to HEW for further proceedings. Accordingly, we affirm the district court's order of February 24, 1978, but reverse its order of March 15, 1978.[1]

## I.  Background

At this stage of the proceedings, no facts have been found, no stipulation of undisputed facts agreed upon, no evidentiary record developed. For purposes of the appeal, however, we will rely, as the district court did, on documents appended to various pleadings. These documents reveal that the principal subject of this lawsuit is a September 7, 1977, Memorandum of Understanding (Memorandum) between the Office for Civil Rights (OCR) at HEW on the one hand and the Board of Education of the City of New York (City Board) on the other. The Memorandum obligated the City Board to alter certain teacher and supervisor employment and assignment practices and to remedy the discriminatory effect of those practices on a phased basis by 1980. For its part, OCR agreed that the City Board's promised actions would constitute compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–86.[2]

The process leading up to negotiation of the Memorandum was set in motion on

---

1. In view of the posture of the case below and the questions certified in the order for appeal under 28 U.S.C. § 1292(b), *see* note 8 *infra*, we do not reach three questions which were not decided on the merits below but are here raised by the appellants. Appellants argue that (1) HEW and the Office for Civil Rights (OCR) do not have power to take action upon allegations that the employment practices of the appellee, Board of Education of the City of New York (City Board) discriminated illegally and unconstitutionally against minorities, (2) the City Board's employment practices complained about in a letter of OCR to the City Board dated November 9, 1976, *see* note 3 *infra,* do not constitute illegal and unconstitutional racial discrimination against minorities and (3) the Memorandum of Understanding between the City Board and OCR, *see* note 2 *infra,* and the City Board's actions carrying out its provisions unconstitutionally denied appellants equal protection of the laws by resulting in "reverse discrimination" and deprived them of liberty and property without due process of law.

2. The Memorandum committed the City Board to undertake a number of actions, some of which include:
    1. Not later than September of 1979, the teacher corps of each District in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

2. Not later than September of 1980, each individual school in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

3. The Board of Education will demonstrate to the Office for Civil Rights, subject to prescribed review, that any failure to meet the commitments set forth in paragraphs one and two hereof results from genuine requirements of a valid educational program. In addition, the Board will demonstrate that it has made and is continuing to make special efforts to overcome the effects of educationally-based program exceptions through effective use of such mechanisms as recertification, recruitment and special assignment of teachers.

*      *      *      *      *      *

6. The Board agrees, as soon as practicable to have performed a study of the relevant qualified labor pool by race, ethnicity, and sex by an independent expert acceptable to the parties and pursuant to methodology and standards agreed to by the parties. . . .

It is understood that this commitment shall not require the Board to lay off any teacher currently employed by the Board or to hire any teacher who has not met appropriate requirements for employment, not inconsistent with this agreement. It is further understood that the commitment made herein does not establish quotas. Failure to meet this

March 18, 1976, when the acting director of OCR wrote to the Chancellor of the City Board to notify him that OCR had received several complaints of discrimination by the City Board against minority teachers. The letter further informed the Chancellor that OCR would conduct a review of employment practices in the New York City school system to evaluate compliance with laws barring discrimination in federally financed programs. Following investigation, OCR informed Chancellor Anker by letter of November 9, 1976, that the City Board was in violation of Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Section 901 of the Education Amendments of 1972, 20 U.S.C. § 1681.[3] That letter discussed the City Board's employment practices, including its discriminatory methods of selection and assignment of teachers, called for submission of a remedial plan, and concluded by offering assistance in preparing the plan. Affidavits on file indicate that, at or about the same time, the OCR director attended a well publicized public briefing at which he explained OCR's findings and invited comments from those in attendance and from the community at large.

OCR's letter of November 9 prompted the establishment of an internal City Board committee to examine OCR's allegations. As part of its study, this committee consulted a number of organizations including some of those participating in this lawsuit as intervenors or amici curiae.[4] On April 22, 1977, before the internal committee had completed its study, the City Board forwarded to OCR its response to the November 9 letter. Without admitting any violation of law, the City Board expressed its determination to rectify "disparate employment opportunities" and proposed an equal employment opportunity plan to "insure equality of opportunity and avoidance of discrimination." The City Board's plan suggested affirmative efforts to increase the number of minority teachers, to improve integration of the teaching staff, and to correct disparities of experience, salary and educational level in the distribution of personnel. The plan also advocated goals for integration of faculty based upon a numerical index, legislative replacement of rank order lists with qualifying lists for teacher selection, and a new system of teacher certification and selection. However, OCR found the plan insufficient and

commitment shall not be considered a violation of this agreement if the Board demonstrates that it has implemented the provisions of this agreement in a good faith effort to meet the commitment made herein.

The Board has advised the Office for Civil Rights that the Board expects to consult with the United Federation of Teachers and others regarding the selection of the independent expert and the standards and methodology to be used in the above study. . . . .

\* \* \* \* \* \*

3. The letter stated in pertinent part:

With respect to employment practices I have concluded that the New York City school system, in violation of section 601 of the Civil Rights Act of 1964 (42 U.S.C. [§] 2000d), has, on the basis of race and national origin:

(1) denied minority teachers full access to employment opportunity through the use of racially discriminatory selection and testing procedures and through the use of racially identifiable employment pools in a manner that discriminatorily restricts the placement of minority teachers;

(2) assigned teachers, assistant principals and principals in a manner that has created,

confirmed and reinforced the racial and/or ethnic identifiability of the system's schools; and

(3) assigned teachers with less experience, lower average salaries and fewer advanced degrees to schools which have higher percentages of minority students.

I have also concluded that the New York City school system, in violation of section 901 of the Education Amendments of 1972 (20 U.S.C. [§] 1681), has, on the basis of sex:

(1) denied females equal access to positions as principals and assistant principals throughout the system;

(2) provided a lower level of financial support for female athletic coaching programs; and

(3) deprived female teachers of seniority rights and other compensation through failure to eliminate the effects of past discriminatory leave policies.

4. These organizations included the American Jewish Congress, the United Federation of Teachers (UFT), the Council of Supervisors and Administrators (CSA), the NAACP and the New York Civil Liberties Union.

notified the City Board on July 6, 1977, that it was principally concerned with the lack of specificity in the City Board's response. Just prior to OCR's rejection of the City Board's plan, the report of the internal City Board committee (the "Gifford Report") was published. The Gifford Report furnished documentary confirmation of the discriminatory and segregative nature of the City Board's employment practices.[5] This report may well have exerted some considerable influence in the City Board's ultimate decision to conclude the Memorandum with OCR.

In negotiating the Memorandum, the City Board requested that the United Federation of Teachers (UFT), though not the other parties, be consulted on the terms of the agreement. The UFT was consulted and it agreed to support the adoption of legislation necessary to effectuate the Memorandum. In a press release the City Board hailed the agreement for having been reached "without resort to the courts or other confrontations that might have polarized our city." The release further described the Memorandum as an agreement which carries forward the existing affirmative action program and accepts a "commit-

ment based on applicable standards of law." After the Memorandum was signed but prior to ratification, the City Board held a public meeting on October 19, 1977, with two weeks' advance notice. Thereafter, the City Board ratified the Memorandum by resolution.

On October 31, 1977, the appellants [6] filed this action seeking a declaration that certain provisions of the Memorandum were unconstitutional, illegal and invalid. They also sought an injunction against the enforcement of those provisions and against requiring the appellants to provide data on the ethnic background of teachers and supervisors. Appellants sought summary judgment or a preliminary injunction. After a hearing, the district court by order of February 24, 1978, ruled only on that part of the motion for a preliminary injunction which sought to enjoin the collection of ethnic data and denied relief.[7] A notice of appeal was filed. This court denied an injunction pending appeal but expedited the appeal.

By the same order, the district court sua sponte directed that the pleadings of all plaintiffs be amended to include a claim that their constitutional and statutory

5. In part, the Gifford Report summarized its conclusions as follows:

(1) *There is an inexplicable, non-rational disparity between the percentage of minority teachers in the New York City school system and the percentage of minority teachers in 46 other non-southern, urban school systems.*

In order to dismiss or affirm the possibility that the recruitment, selection, and placement practices of the New York public schools contributed to this disparity, we developed a sophisticated econometric model of the social and economic relationships affecting the size of the minority teacher population in New York City and 46 other non-southern, urban cities. The results of the analysis show, in rather stark terms, that the percentage of minority teachers in the New York City public schools is less than one-half of what one would expect to find, if New York City were to "behave" like other cities.

This result, in and of itself, does not constitute proof of discrimination. It does indicate, however, that the percent of minority teachers in the public school system of New York City is far lower than it should be, given the available pool of minority college graduates

in New York City and the characteristics of the New York City labor market.

(2) *Minority teachers are channeled into elementary and junior high schools in a manner that corresponds to the racial composition of the schools.*

This finding comes as no surprise since these results were anticipated by the state legislature when it mandated that teachers hired through the alternative method (NTE and "out of rank order" teachers) be restricted to elementary and junior high schools having high concentrations of educationally disadvantaged pupils.

(Emphasis in original.)

6. The district court granted numerous motions to intervene, including those of the UFT, the CSA, several community school boards, the Coalition of Concerned Black Educators, several black teachers represented by the NAACP, Ronald Ross (a black teacher represented by the New York Civil Liberties Union), the Public Education Association, and the American Civil Liberties Union.

7. The district judge stayed his order for 14 days to give appellants an opportunity to appeal.

rights were abridged by OCR's failure "to afford them and other interested persons the opportunity . . . to participate in the administrative proceedings." The district court then ordered all parties to appear on March 7, 1978, to show cause why the action should not be remanded for OCR's failure to afford such participation. At the March 7, 1978, hearing no party requested a remand but rather each sought to have the proceedings continue in the district court so that the district judge might decide the legality of the Memorandum. However, on March 15, the court ordered the agreement vacated and remanded the case to OCR. It also ordered the City Board relieved of its obligations under the Memorandum, denied all pending motions as moot with leave to renew, and stayed all proceedings pending completion of the administrative hearings on remand. This appeal followed.[8]

## II. *Discussion*

### A. Denial of the Preliminary Injunction Against Collection of Ethnic Data

Plaintiffs sought to enjoin the mandatory answering of ethnic questionnaries. These questionnaries were distributed to the school system's community school districts. All supervisors and teachers employed in the city's public schools were required to answer questions pertaining to their race, color, sex and national origin. In denying appellants' motion in the February 24 order, the district court made no findings of fact or conclusions of law, although it did note that there is a clear right and obligation of authorities to gather data in order to determine, *inter alia*, whether there has been unlawful discrimination.

■ This court has recently clarified the standard for issuance of a preliminary injunction: there must be a showing of possible irreparable injury *and* either (1) proba-

ble success on the merits *or* (2) sufficiently serious questions *going* to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Selchow & Righter Co. v. McGraw-Hill Book Co.*, No. 77–7569, slip op. at 3533, 3537, 580 F.2d 25 at 27 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *see* Mulligan, *Foreword—Preliminary Injunction in the Second Circuit*, 43 Brooklyn L.Rev. 831, 832–33 (1977). Since appellants neither presented nor sought to present any evidence in support of their motion for a preliminary injunction, all that the district court had before it was a question of law. Absent any evidence, the district court could not conclude that the appellants were likely to suffer irreparable injury, much less that the balance of hardships weighed decidedly in their favor. *See Gillespie & Co. of New York v. Weyerhaeuser Co.*, 533 F.2d 51, 53 (2d Cir. 1976) (per curiam).

Moreover, appellants have failed to show that they are likely to succeed on the merits. *See id.* They argue, first, that because the agreement between OCR and the Board was vacated by the district court, any racial/ethnic survey to be conducted in conjunction with the Memorandum is invalid. However, they have made no showing that the survey of the ethnic composition of the existing staff of the school system would only be conducted because the Memorandum provided for it. Indeed, for all that appears in the record, this survey is one routinely conducted by the City Board as part of its annual school census.

■ Appellants also argue that because Title VI does not prohibit racial/ethnic discrimination in employment where providing employment is not a primary objective of federal aid, 42 U.S.C. § 2000d–3,[9] OCR can-

---

8. The March 15 order was certified in accordance with 28 U.S.C. § 1292(b). This court granted petitions for leave to appeal and cross-appeal and consolidated the appeal from the March 15 order with the appeal from the February 24 order.

9. Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objec-

not lawfully seek statistics regarding the ethnic and racial composition of the teaching staff. However, appellants have mischaracterized the nature of the OCR investigation. The charging letter of November 9, 1976, specifically noted that its concern with discriminatory employment practices was motivated by the unfortunate effect that these practices exercise on minority schoolchildren: "[B]y assigning teachers to schools in such a manner . . . [,] minority children are generally taught by teachers with less experience, lower salary and fewer advanced degrees." Accordingly, OCR's investigation falls within the parameters of 42 U.S.C. § 2000d,[10] and not 42 U.S.C. § 2000d–3, *see* note 9 *supra,* since the objective of OCR's investigation was to alleviate discrimination against minority schoolchildren and not against minority teachers as such.[11] In the context of this OCR investigation, then, the collection of racial and ethnic data is authorized by Title VI.[12] *See United States v. Jefferson County Board of Education,* 372 F.2d 836, 882–84 (5th Cir. 1966), *aff'd,* 380 F.2d 385 (5th Cir.) (en banc), *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

Appellant's additional arguments that the proposed census would violate other federal statutes and the Constitution are unpersuasive. The Privacy Act of 1974, 5 U.S.C. § 552a, is invoked but it does not prohibit the collection or retention of such data in this context. Title VI and its regulations authorize the collection of staff data which in turn is permitted to be maintained under 5 U.S.C. § 552a(e)(1).[13] Nor does the Equal Education Opportunities Act, 20 U.S.C. § 1751, prohibit the collection of racial and ethnic staff data.[14] At this stage of the record, where it does not appear whether or not teacher and supervisor assignments in the New York public schools violate Title VI, plaintiffs' assertion that these practices are not violative cannot be taken as fact. Thus any suggestion that OCR's actions are directed at overcoming simple racial imbalance is premature.

Finally, the Constitution itself does not condemn the collection of this data. *Cf. United States v. State of New Hampshire,*

---

tive of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d–3.

10. No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*Id.* § 2000d.

11. 45 C.F.R. § 80.3(c)(3), which deals with the relationship between 42 U.S.C. § 2000d and 42 U.S.C. § 2000d–3, provides:

Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the ground of race, color, or national origin in the employment practices of the recipient or other persons subject to the regulation tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and non-discriminatory treatment of, beneficiaries.

12. OCR has authority to collect racial data in school systems under the Emergency School Aid Act as well. *See* 20 U.S.C. § 1605(d)(1); 45 C.F.R. § 185.13(*I*); *Board of Education v. Califano,* 584 F.2d 576 at 582–585 (2d Cir. 1978).

13. Each agency that maintains a system of records shall—

(1) maintain in its records only such information about an individual *as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President[.]*

5 U.S.C. § 552a(e)(1).

14. No provision of this Act shall be construed to require *the assignment or transportation* of students or teachers in order to overcome racial imbalance.

20 U.S.C. § 1751; *cf. Darville v. Dade County School Board,* 497 F.2d 1002, 1004–05 (5th Cir. 1974) (20 U.S.C. § 1651, which is identical to 20 U.S.C. § 1751, does not foreclose school assignment plans voluntarily adopted by school board which exceed constitutional minimums and the means, such as transportation, to carry out the plan).

539 F.2d 277, 280–82 (1st Cir.) (upholding as constitutional a requirement pursuant to § 709(c) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–8(c), that the State provide racial and ethnic employee data to the federal government on an EEO–4 form), *cert. denied,* 429 U.S. 1023 (1976). The one-sentence argument that the census produces a Fourth Amendment violation is frivolous; there is no search or seizure here involved. Nor is there a violation of the constitutional right of privacy of teachers and principals within *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). *See* Note, *On Privacy: Constitutional Protection for Personal Liberty,* 48 N.Y.U.L. Rev. 670, 673–78, 697–701, 770–72 (1973); *cf. Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (statute requiring submission of form with patient's name to State Department of Health in case of certain prescription drugs not unconstitutional); *Schachter v. Whalen,* 581 F.2d 35 (2d Cir. 1978) (statute granting power to subpoena medical records from doctor under investigation by State not unconstitutional).

## B. District Court Remand to HEW

■ The federal appellees, as cross-appellants, argue strenuously that the district court erred in sua sponte remanding the case to HEW.[15] We agree.

■ Section 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1,[16] provides for three types of action to secure compliance with the substantive provisions of Section 601, 42 U.S.C. § 2000d:[17] (1) refusal to grant or termination of assistance, (2) other means authorized by law such as a reference to the Department of Justice, 45 C.F.R. § 80.8(a);[18] and (3) volun-

---

**15.** Cross-appellants contend that the district court erred in raising and deciding a claim for relief not made by any party on the ground that there was no case or controversy. Since none of the parties except CSA raised any procedural question and since CSA itself did not specifically seek the remand to HEW which the district court ordered, cross-appellants argue that the propriety of the remand has not been presented in an adversary context. *See O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Jenkins v. McKeithen,* 395 U.S. 411, 423, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (Marshall, J.); *Flast v. Cohen,* 392 U.S. 83, 96–97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). We are persuaded, however, that the requisite case or controversy exists. Even though CSA did not in haec verba request the district court to remand the case to HEW, CSA did ask that the memorandum be held illegal for not permitting its participation; and CSA was careful to pray for such relief as the court deemed proper. *See Robinson v. Lorillard Corp.,* 444 F.2d 791, 802–03 (4th Cir. 1971), *cert. dismissed,* 404 U.S. 1006, 1007, 92 S.Ct. 573, 30 L.Ed.2d 655 (1972); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2664, at 108–09 (1973); Fed.R. Civ.P. 54(c). In addition, at this stage in the proceedings, CSA has explicitly argued that the remand to HEW was proper. Consequently, the district court had and this court has jurisdiction to decide the question of the remand to HEW.

**16.** Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such non-compliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. . . .

42 U.S.C. § 2000d–1.

**17.** *See* note 10 *supra.*

**18.** If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law. Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any

tary means. Where the agency seeks to compel compliance through termination of funds or other means, Section 602 requires that the agency proceed by formal means including an administrative hearing at which a record is made. Before doing so, however, HEW must attempt to secure compliance by voluntary means. 42 U.S.C. § 2000d–1; *see* note 16 *supra*.[19]

While HEW's regulations specify a variety of procedures to effectuate fund termination,[20] they do not provide for public par-

---

assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law.

45 C.F.R. § 80.8(a).

19. Congress's intent that HEW use voluntary means to secure compliance with Title VI before resorting to fund termination is clear. Senator Humphrey stated that

> [t]he first step, in all cases, will be advice to the appropriate person or persons and a reasonable effort to secure voluntary compliance. Obviously *no hearing is required in connection with such efforts* at voluntary compliance.

110 Cong.Rec. 8979 (1964). And Senator Ribicoff added:

> The agency could not immediately cut off the funds. As I view this matter, I hope that in the case of every agency and every county involved the officials of the agency would sit down with the officials of the county and would try to settle the problems voluntarily, before any action would be taken, including action to cut off funds, which would be the last resort.

110 Cong.Rec. 13129 (1964).

20. (c) . . . No order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure *to comply* and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after *opportunity for hearing,* of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant *to this part,* (3) *the expiration of 30* days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action. . . .

(d) . . . No action to effect compliance by any other means authorized by law shall be taken until (1) the responsible Department official has determined that compliance cannot be secured by voluntary means, (2) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance, and (3) the expiration of at least 10 days from the mailing of such notice to the recipient or other person. During this period of at least 10 days additional efforts shall be made to persuade the recipient or other person to comply with the regulation and to take such corrective action as may be appropriate.

45 C.F.R. § 80.8(c)–(d).

(a) *Opportunity for hearing.* Whenever an opportunity for a hearing is required by § 80.8(c), reasonable notice shall be given by registered or certified mail, return receipt requested, to the affected applicant or recipient. This notice shall advise the applicant or recipient of the action proposed to be taken, the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for this action, and either (1) fix a date not less than 20 days after the date of such notice within which the applicant or recipient may request of the responsible Department official that the matter be scheduled for hearing or (2) advise the applicant or recipient that the matter in question has been set down for hearing at a stated place and time. . . . An applicant or recipient may waive a hearing and submit written information and argument for the record. The failure of an applicant or recipient to request a hearing for which a date has been set shall be deemed to be a waiver . . . ..

(b) *Time and place of hearing.* . . . Hearings shall be held before a hearing examiner . . . ..

(c) *Right to counsel.* In all proceedings under this section, the applicant or recipient and the Department shall have the right to be represented by counsel.

(d) *Procedures, evidence, and record.* (1) The hearing, decision, and any administrative review thereof shall be conducted in conformity with sections 5–8 of the Administrative Procedure Act, and in accordance with such rules of procedure as are proper (and not inconsistent with this section) relating to the conduct of the hearing, giving of notices subsequent to those provided for in paragraph (a) of this section, taking of testimony, exhibits, arguments and briefs, requests for findings, and other related matters. Both the Department and the applicant or recipient shall be entitled to introduce all relevant evidence . . . ..

(2) Technical rules of evidence shall not apply to hearings conducted pursuant to this part, but rules or principles designed to assure production of the most credible evidence available and to subject testimony to test by cross-examination shall be applied where reasonably necessary by the officer conduct-

ticipation or a hearing when HEW acts informally.[21] In addition, pursuant to Executive Order 11764 of January 21, 1974, granting the Attorney General authority to prescribe standards and procedures for Title VI enforcement, the Attorney General has adopted regulations which provide simply that any agreement to "take remedial steps . . . shall be set forth in writing by the recipient and the federal agency[,] . . specify the action necessary for the correction of Title VI deficiencies and . . be available to the public." 28 C.F.R. § 42.411(b). No other procedures, such as a hearing or public participation, are required. These regulations are entitled to some weight in construing the meaning of Title VI. *See Lau v. Nichols,* 414 U.S. 563, 566–69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Because HEW did not seek compliance by fund termination, but rather by a voluntary agreement, HEW was not required to afford cross-appellees an opportunity to participate. The action taken here to effect

compliance was precisely the type of action contemplated by Congress in using the phrase "voluntary means." 42 U.S.C. § 2000d–1; *see* note 16 *supra.*

Nevertheless, the district court held that participation was mandatory on the basis that the agreement was not voluntary. The principal reason for the district court's finding of involuntariness was that the City Board, along with the City as a whole, was in the midst of a fiscal crisis and presumably could not afford a fund termination while it litigated the issue of Title VI compliance. But the only fund termination sought by HEW related not to Title VI funds but to Emergency School Aid Act funds.[22] To be sure, a threat of potential fund termination lurked in the background since without such leverage voluntary compliance might possibly never be achieved. And after all, if there is lack of compliance, HEW is obligated to enforce the statute ultimately by terminating funds. *Adams v. Richardson,* 156 U.S.App.D.C. 267, 271, 480 F.2d 1159, 1163 (1973).[23] Undoubtedly then there is a certain amount of coercion inher-

---

ing the hearing. The hearing officer may exclude irrelevant, immaterial, or unduly repetitious evidence. All documents and other evidence offered or taken for the record shall be open to examination by the parties and opportunity shall be given to refute facts and arguments advanced on either side of the issues. A transcript shall be made of the oral evidence except to the extent the substance thereof is stipulated for the record. All decisions shall be based upon the hearing record and written findings shall be made.

 \*   \*   \*   \*   \*   \*

45 C.F.R. § 80.9(a)–(d).

21. (d) *Resolution of matters.* (1) If an investigation pursuant to paragraph (c) of this section indicates a failure to comply with this part, the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible. If it has been determined that the matter cannot be resolved by informal means, action will be taken as provided for in § 80.8.

45 C.F.R. § 80.7(d)(1).

22. *See Board of Education v. Califano, supra.*

23. *See* Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1772–73 (1975):

The resource and delay costs of formal proceedings are incurred by the agency as well as private parties and may seriously undermine the effective discharge of agency responsibilities. These burdens will mount as previously informal decisions on enforcement policies are subjected to formal processes of resolution. Increased procedural formalities may work to the disadvantage of public interest groups by exhausting their limited resources and providing organized interests a basis for delaying agency enforcement actions. Moreover, formal trial-type proceedings in many contexts may be inferior to informal negotiations as a means of agency dispute resolution and decision-making. The complex scientific, technological, social and economic issues presented in so much of current administration are often ill-suited for resolution by adjudicatory procedures that produce gargantuan records whose size "varies inversely with [their] usefulness." Judicialization of agency procedures and the expansion of participation rights may also aggravate the tendency for the agency to assume a passive role, focusing on the unique character of each controversy in order to reach an ad hoc accommodation of the particular constellation of interests presented.

(Footnotes omitted.)

ent in the enforcement scheme. *See United States v. Jefferson County Board of Education, supra,* 372 F.2d at 856 (quoting Report of the United States Commission on Civil Rights, *Survey of School Desegregation in the Southern and Border States—1965–1966,* 2).

Undercutting any actual coercion, however, are several points. The City Board's own study, the Gifford Report, confirmed the conditions cited in the November 9 letter from OCR. Moreover, the City Board's press release indicated that the agreement had been reached in a spirit of cooperation. And of course, the lack of participation by the Council of Supervisors and Administrators (CSA) cannot render a voluntary agreement involuntary. The City Board's commitments under the Memorandum, despite its impact on teachers and supervisors, came about by the City Board's decision to comply with OCR's interpretation of Title VI, not by any fund-termination action by OCR. *Cf. Maher v. Roe,* 432 U.S. 464, 475–76 & n. 9, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977) (distinction between direct "interference with a protected activity and . . . encouragement of an alternative [permissible] activity"). In addition, there was ample opportunity to communicate with the City Board between the time the terms of the agreement became publicly known and the time of its ratification, but no party, including CSA, sought to participate during that hiatus, although most parties were consulted in the interim.

In any event, the statutory scheme requires a hearing with notice only when HEW seeks fund termination. *See, Board of Public Instruction of Palm Beach County v. Cohen,* 413 F.2d 1201, 1202–03 (5th Cir. 1969). Where, as here, Congress has determined what procedures shall be required in effecting compliance with Title VI, the courts may not override that determination simply because they believe other procedures would be preferable. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

Order denying preliminary injunction on collection of racial/ethnic data affirmed; order remanding to HEW for administrative proceedings reversed; cause remanded to the district court for hearing on the merits.