**ANTI-SLIP TECHNOLOGIES, INC., Plaintiff,**

v.

**SAXON INDUSTRIES, INC., E. Greene and Company and Fonda/Royal Lace, Divisions of Saxon Industries, Inc., Defendants.**

No. 81 Civ. 2105 (KTD).

United States District Court, S. D. New York.

April 29, 1981.

Miller, Singer, Michaelson & Raives, New York City, for plaintiff; Peter N. Greenwald, New York City, of counsel.

Feldesman & D'Atri, New York City, for defendant; Justin W. D'Atri, New York City, of counsel.

OPINION

KEVIN THOMAS DUFFY, District Judge:

This is a motion for a preliminary injunction. This opinion shall constitute findings of fact and conclusions of law pursuant to Rule 65(d) of the Fed.R.Civ.P.

Bernard Kaminstein is the owner of a hardware store and an inventor of sorts. He has a technical background as a chemist and has a number of patents. In or about June, 1979, Kaminstein was informed by a sales representative servicing American Airlines that the polyester napkin used in airline flights for food service was not thoroughly acceptable to the airline. Kaminstein agreed to attempt to develop a nonslip product to cure the problem. His research led him to develop a paper placemat upon which was deposited certain chemical formulae which would cause the paper to be "anti-slip," thus inhibiting any potential sliding of plates and utensils used in the

food service available on airline flights. A feature attractive to the airlines apparently is that the anti-slip product developed by Kaminstein is such that the placemats do not stick to each other and can be dispensed from a large roll. Kaminstein applied for a patent in respect to the anti-slip paper placemat. He produced samples of the paper and forwarded it to American Airlines. Apparently, American Airlines was pleased with the product and ordered a sample of 25,000 units on or about January 30, 1980. The units were originally priced at $15.50 per roll of paper. On or about May 13, 1980, the airline placed a second order for 250,000 units and the price was eventually reduced to $13.50 per roll of paper with 1,000 sheets per roll.

Recognizing the product's potential and eager to place large orders for the product, the purchasing staff of American Airlines encouraged Kaminstein to become associated with a large manufacturing firm to handle the volume of business expected to be produced. By this time, he had assigned the patent to the plaintiff Anti-Slip Technologies, Inc. ["Anti-Slip"] owned by himself and his brother-in-law.

In or about August, 1980, Kaminstein, at the urging of an employee of his hardware store, contacted Richard Greene, the general manager of E. Greene and Company which is a division of the defendant Saxon Industries, Inc. ["Saxon Industries"]. A meeting was held between Greene and Kaminstein at which Greene was informed by Kaminstein that the product was a trade secret and that Anti-Slip was attempting to patent the formula for production. Greene indicated that Saxon Industries had been attempting to develop such a product for some years but had been unsuccessful. Greene agreed that if Kaminstein left a roll of the anti-slip paper with him that Saxon Industries would not analyze the paper for purpose of copying it and that all of the information surrounding it would be held in the strictest of confidence. Initial negotiations for the manufacture of the product included a $50,000 advance to Anti-Slip and royalties of 3 percent on manufactured sales.

At some time shortly thereafter, Greene developed a proposal of the anti-slip placemat for presentation to Saxon's corporate office. The proposal sets forth Greene's expectations for the success of the product owned by Anti-Slip. Greene indicated that American Airlines had ordered 250,000 units of the anti-slip product. Greene also suggested a potential market for anti-slip paper placemats of $25 million. A copy of the proposal was forwarded to Kaminstein and on or about September, 1980, Greene informed Kaminstein that the proposal had been approved and that a trip to the Fonda/Royal Lace plant was organized for a meeting among Kaminstein, Greene and Gordon Ouimette a vice-president of the Fonda/Royal Lace Division of Saxon Industries. Kaminstein and Greene flew to Ft. Wayne, Indiana on September 4, 1980, where they met with Ouimette. Kaminstein brought along two quart bottles of the formula used to coat the paper to produce the anti-slip placemat. Kaminstein informed Greene and Ouimette about the purchase order from American Airlines and that he had initial overtures from Pan American Airlines and from the American Hospital Supply Corporation. He once again advised the representatives of the defendant that the matters should be regarded as trade secrets and that he did not wish to disclose anything without some protection for the plaintiff Anti-Slip. Upon being assured that everything would be confidential, Kaminstein produced the two quart bottles of formula. Kaminstein testified that Ouimette after smelling the formula indicated that he knew the general nature of the product. Ouimette denied that he ever stated this. I did not believe Ouimette.

Ouimette, Greene and Kaminstein agreed that a larger amount of the formula would be needed for a trial run of the process at the Fonda/Royal Lace plant. After Kaminstein reiterated his desire that everything be held in confidence by Saxon Industries, Inc., he agreed to a future meeting at the Fonda/Royal Lace plant where he would supply sufficient chemical formula to

perform the test run. He requested that a confidentiality and non-disclosure agreement be prepared and executed on behalf of Saxon Industries. The discussion also involved the type of paper to be used in the test run. Once again, Kaminstein left a supply of anti-slip paper with Saxon Industries, Inc.

On or about October 25, 1980, a purported confidentiality agreement was forwarded by Greene and Ouimette to Kaminstein. Instead of executing and returning the agreement, Kaminstein put it aside. The agreement provided *inter alia*: "notwithstanding the termination of the confidentiality established by this agreement, the divisions agree that they shall not be prevented from selling or offering for sale any product with special anti-slip properties (a) if such item has been developed by the divisions with reference to the confidential information provided by Anti-Slip Technologies under this agreement . . . ." In effect, the agreement permitted E. Greene and Company after sixty days to use any of the trade secrets which Kaminstein had given to the defendants.

Eventually, Kaminstein sent the agreement along to his attorneys for their comments. Before receiving such comments, however, Kaminstein arranged for a further meeting with Greene and Ouimette in Ft. Wayne in order to do a trial run of the product. The meeting was set up for December 4, 1980. In anticipation of that meeting, plaintiff sent a sealed five-gallon drum of the chemical composition used to coat the paper and produce its anti-slip properties. One ingredient, however, was not included in the formula. The agreement between Kaminstein, Greene and Ouimette was that the drum containing the emulsion was not to be opened until all three were present at the scheduled meeting. That meeting was not held because Kaminstein became ill.

According to Kaminstein, shortly after the date of the scheduled meeting, he received a phone call from Ouimette who informed him that the formula which was sent was no good because it caused the paper to become sticky and to adhere to itself. Kaminstein further testified that he explained that this stickiness resulted because the formula which was sent was not complete. Again according to Kaminstein, Ouimette said in words or substance that "you're a pretty tricky guy." Sometime between this phone call and December 22, 1980, Kaminstein and/or his brother-in-law contacted Greene with a view toward renegotiating or continuing negotiations as to the deal concerning the licensing of defendant Saxon Industries to produce the anti-slip paper. At this meeting, Kaminstein's brother-in-law apparently attempted to increase the initial payment to be made by Saxon Industries from $50,000 to $100,000.

On December 22, 1980, the plaintiff Anti-Slip Technologies received back from Fonda/Royal Lace the drum which had been sent out in anticipation of the December 4 meeting. The drum was produced in court. It was clear that there were drippings of a chemical on the sides of the drum indicating that a quantity had been ladled out of the drum. The drum had been sent to Ft. Wayne by common carrier and, at the hearing, the bill indicated the weight of the drum at the time it left New York. A three pound discrepancy exists between that bill and the bill from the same common carrier for the trip back from Ft. Wayne to New York.

On or about January 22, 1981, Greene called Kaminstein and stated that all negotiations were off and that Saxon had developed a better product and that Saxon and its Division would be competing with the anti-slip product in the market place.

Ouimette testified that in the latter part of December, Greene had advised him that the negotiations with plaintiff were terminated. It was unclear whether Greene directed Ouimette or Ouimette on his own then turned over to a coating supplier of Saxon in Vermont samples of the anti-slip paper with a request that certain laboratory tests be done on the paper. Ouimette testified that this came about because the Vermont manufacturer had indicated that it was already producing a non-slip coating

for paper which was used in shoe boxes. He further stated that the tests which he requested be made were solely as to the adhesive qualities of the two coatings. In any event, it is clear that starting sometime in January, Saxon started producing its own anti-slip paper.

Donald W. Feller, sales representative for Anti-Slip, testified that he had been advised by various airlines, including Pan American Airlines, and by the American Hospital Supply Corporation that Saxon was producing a non-skid paper placemat. Feller extracted from these potential customers a copy of the advertising that E. Greene and Company was using to sell its anti-skid paper placemat. The similarity between the proposal made by Greene to the Saxon corporate headquarters for the plaintiff's anti-skid placemat and the selling literature used by E. Greene for its own anti-skid paper placemat is striking.

## DISCUSSION

It is in the light of this factual background that I must weigh the plaintiff's request for a preliminary injunction.

In one of the more recent of the many restatements of the standard for issuance of a preliminary injunction, the Court of Appeals for this Circuit in *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605 (2 Cir., 1978) said "there must be a showing of possible irreparable harm and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 610.

In my view, the plaintiff here has satisfied this standard. The plaintiff is a start-up company with a product for which apparently there will be a great demand. Because of this great demand, its principal customer suggested that the plaintiff tie in with a larger, more established manufacturer so that production could be assured in large quantities.

The defendant, meanwhile, had attempted to develop just such a product but had been unable to do so. When presented with the opportunity to obtain a license at a low cost, the defendant gave assurances that the product and its potential customers, some already contacted by the plaintiff, would be held in the strictest of confidence.

The defendant having received the drum of the partial formula used to coat the product extracted some of that formula although this was done in breach of an express agreement. I can only conclude that this extraction was done for the purposes of chemical analysis. Having discovered that the mixture supplied lacked one ingredient, the defendant submitted a sample of the anti-slip paper containing the coating to the laboratory of another coating manufacturer. It would appear that a simple spectrochromography test of the paper could indicate to such a coating manufacturer the missing ingredient. I must conclude that there is, thus, a fair ground for litigation between the parties.

The balance of hardship tips decidedly toward plaintiff here. The defendant attempted to use its greater economic power to force the plaintiff to accept what appears to be an unconscionable confidentiality agreement and failing to do that, even breached the terms of the agreement which they had unconscionably proposed. Should the defendant be free to exploit its economic position, it surely will drive the plaintiff, a small company with scarce resources, out of what is concededly a new and highly profitable field.

That there will be irreparable harm is clear. The chances for a sometime inventor and owner of a hardware store without preliminary relief, to fight a large corporation through litigation without severe and indeed, irreparable harm need not be expounded upon.

Accordingly, a preliminary injunction will issue enjoining the defendants, their subsidiaries, agents, servants and all persons in active concert with them from advertising, marketing, selling or attempting to sell or take orders for a product for a non-skid

paper placemat derived from the confidential information imparted to them by the plaintiff and from using or disclosing further in any manner such confidential information. Needless to say, this injunction will prohibit the defendant from disparaging in any manner plaintiff's product or ability to produce it; or interfering with plaintiff's purchase orders present or future. Settle order on three days' notice.