**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**CHAMPION SPORTS MANAGEMENT, INC., and Richard Hirschfeld, Defendants.**

**No. 84 Civ. 5778(RJW).**

United States District Court, S.D. New York.

Nov. 1, 1984.

Securities Exchange Commission, New York City, Ira Lee Sorkin, Regional Administrator, New York City, for plaintiff; Sandra Dolan, Anne C. Flannery, Margaret M. McQueeney, Venrice R. Palmer, Sp. Trial Counsel, Stephanie Sklar, New York City, of counsel.

Sacks, Sacks & Larkin, Norfolk, Va., for defendant Hirschfeld; Stanley E. Sacks, Norfolk, Va., Attorney in Charge, Andrew M. Sacks, Norfolk, Va., of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT J. WARD, District Judge.

### FINDINGS OF FACT

In August, 1983, Champion Sports Management, Inc. ("Champion"), a Virginia corporation, filed a registration statement with the Securities and Exchange Commission (the "Commission") pursuant to Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, on Form S–1, 17 C.F.R. § 239.11, with respect to its proposed initial public offering.

During the period from August, 1983, through January, 1984, Champion filed with the Commission five amendments to the initial registration statement. The registration statement was declared effective on January 19, 1984.

Thereafter, three post-effective amendments were filed with the Commission, on March 5, March 9, and March 19, 1984 respectively. The Champion prospectus dated January 13, 1984, as amended March 19, 1984, was filed as a part of the registration statement and was distributed to the public in connection with the offering. A prospectus supplement was filed with the Commission and was attached to the prospectus on July 10, 1984.

Richard Hirschfeld ("Hirschfeld") is an attorney. He has been a member of the Virginia bar for the past thirteen years, practicing primarily in the areas of real estate and corporate law. Hirschfeld is the president, treasurer, chief operating officer and a director of Champion. In addition, Hirschfeld is also the secretary-treasurer and a director of Hirsch-Chemie, Ltd. ("Hirsch-Chemie"), a public company with its principal office located at the same address in Virginia Beach, Virginia, as Champion's principal offices.

Hirschfeld holds 26.5 percent of the outstanding shares of Hirsch-Chemie, which in turn is a major shareholder and a creditor of Champion.

Until on or about March 24, 1984, Hirsch Capital Corporation ("Hirsch Capital") was a wholly-owned subsidiary of Hirsch-Chemie. Hirsch Capital is a major shareholder of Champion, owning 9.5 percent of Champion's outstanding shares. By virtue of his 26.5 percent interest in Hirsch-Chemie, Hirschfeld is a major shareholder of Champion. His ownership is not disclosed in the Champion prospectus nor does the prospectus adequately disclose the relationship among Champion, Hirsch-Chemie and Hirsch Capital.

Champion, which was organized to engage in the recruitment, training and promotion of professional boxers, has a board of directors which includes several famous boxing personalities. Included among the officers and directors listed in the prospec-

tus are: Muhammed Ali, chairman of the board, Jabir Herbert Muhammad, chief executive officer and director, Sheldon Saltman, executive vice-president, Henry C. Grooms, senior vice-president, Ernie Shavers, vice-president, and Howard Bingham, vice-president. Jabir Herbert Muhammad, who is listed as Champion's chief executive officer and a director, has attended only two board meetings, as has Ali. Although Muhammad is the chief financial officer of Champion, Muhammad testified that he is for the most part unaware of the financial liabilities of the company since Hirschfeld conducts all loan transactions.

The prospectus was drafted by counsel for Champion. Hirschfeld reviewed the prospectus and played an integral part in its final preparation. Neither Ali nor Muhammad had any part in the preparation of the prospectus, nor does the Court find them to have acted wrongfully.

### The $600,000 Note

On August 19, 1983, Champion, through Hirschfeld, entered into an agreement with Edward S. Garcia, Sr. ("Garcia") and Sandra H. Garcia to purchase an 88-acre country estate near Virginia Beach. In connection with his sale of the real estate to Champion, Garcia agreed to accept a $600,000 promissory note bearing the Swiss prime rate. He did so because Hirschfeld told him the Swiss prime rate was the rate "the people in Europe wanted to put on the note...."

Champion agreed to make an initial down payment of $100,000 and obligated itself to pay a total purchase price of $1.7 million in installments. The first payment was in fact made by an entity called Ottimo Stabilimente Immobiliere ("Ottimo"), by check drawn on the Bank of Virginia Beach (the "Bank").

Between August, 1983, and December, 1983, Champion paid a total of $600,000 in non-refundable monthly installments.

In or about August, 1983, Hirschfeld, together with his family, moved on the estate. They continued to live on the estate until May, 1984, when Garcia's lawyers told them to move.

In January, 1984, Champion found itself with insufficient funds with which to continue to make payments on the property. On or about January 15, 1984, Hirschfeld requested that Garcia agree to the assignment of the purchase agreement. This assignment was effected by a letter agreement dated January 15, 1984, from Hirschfeld to Garcia, wherein Hirschfeld advised Garcia that the ownership of the property should vest and have title in a new entity to be formed called CSM Properties, Inc. ("CSM"). In consideration for the sum of $1, Garcia agreed to the assignment. Garcia testified that he believed at the time he agreed to assign the purchase agreement to CSM that CSM was a holding company for the real estate of Champion. Hirschfeld admits that he formed CSM on January 16, 1984, solely for the purpose of acquiring the rights and obligations of Champion under the real estate contract.

On February 16, 1984, a meeting of the board of directors of CSM was held. According to the minutes of the meeting, Hirschfeld was the only person present and acted as chairman. Hirschfeld elected Janice and Walter Smith as officers and directors of CSM, and resolved to issue the aforementioned promissory note for $600,000 to Champion in connection with the purchase of the real estate contract. Although Hirschfeld resigned as a director, he continued to act on behalf of CSM and to serve as CSM's agent for service of process.

First Leisure International, Inc. ("First Leisure"), a purported Utah corporation with which the Smiths were associated, was a co-maker of the $600,000 note. At the time CSM issued this note to Champion, Hirschfeld knew that CSM had no assets other than its right to purchase the Garcia property. As far as First Leisure was concerned, Hirschfeld knew that its principal, Ron L. Smith, was in Utah State Prison on what appears to have been a charge of issuing a bad check. In fact, in or about January, 1984, Hirschfeld visited Smith in

the prison. Nevertheless, Hirschfeld claims that he relied primarily on First Leisure to pay the note because CSM had no assets.

Hirschfeld accepted oral reports from Michael Howery, a Utah attorney whom he had asked to check the creditworthiness of First Leisure. However, Hirschfeld never obtained a certified or uncertified financial statement, credit report or other documentation on First Leisure. Although Howery testified at one point that First Leisure was a Delaware corporation, and later that it was a Utah corporation, the Commission proffered a certificate dated October 4, 1984, signed by Randall R. Smart, Director, Division of Corporations and Commercial Code, State of Utah, stating that his office had been unable to locate any corporation under the name First Leisure International, Inc.

The Court finds that if it existed at all, First Leisure did not have sufficient assets to pay the $600,000 note and Hirschfeld at all relevant times knew or should have known First Leisure could not pay the note.

### Hirschfeld's Affiliation with CSM

Even after the assignment of the purchase agreement to CSM, Hirschfeld continued to negotiate on behalf of CSM with Garcia for a closing date. On February 16, 1984, Hirschfeld, on CSM's behalf, hand-delivered a cashier's check to Garcia in the sum of $1,000 as consideration for an extension of the closing date. This was the only payment CSM ever made toward the remaining $1,100,000 of the purchase price.

Thereafter, on May 15, 1984, CSM and Hirschfeld were served with written notice of default by Garcia. Following the default, Garcia reclaimed his property.

The Champion prospectus describes the events surrounding the purchase agreement and its subsequent assignment to CSM as follows:

> On August 19, 1983, the company contracted to purchase a proposed training facility situated on 88 acres in Virginia Beach, Virginia, for which it made non-refundable down payments totaling $600,000 against the $1,700,000 purchase price. On January 15, 1984, the company was exculpated from responsibility under this contract, as amended, which was assigned and transferred to an unaffiliated third party in consideration of $600,000 in the form of an unsecured negotiable promissory note bearing 12 percent interest and due on December 31, 1984. Inasmuch as this note represents a principal asset of the company, a failure on the part of the assignee to retire this note on a timely basis would have an adverse effect on the company's working capital position, especially if only the minimum of Units offered hereunder are sold.

The foregoing description fails to disclose that the co-maker of the promissory note, CSM, had absolutely no money or other assets with which to repay the note, that CSM was a shell corporation with nothing more than its rights to buy the property, or that under the Garcia contract, CSM was already obligated to pay $1.1 million which it did not have.

The paragraph leaves the misleading impression that Champion had an asset in the form of the $600,000 promissory note. Moreover, the statement that the purchase agreement was assigned and transferred to an *unaffiliated third party* (CSM) is at a minimum misleading.

The "Subsequent Events" section of the prospectus, which mentions the assignment, has never been amended to include a description of subsequent material events such as the default by CSM under the purchase agreement and the subsequent repossession of the property by Garcia.

### Misrepresentations and Omissions Relating to Champion's Indebtedness

On November 21, 1983, Champion, by its president, Hirschfeld, issued a note payable to the Bank in the amount of $600,000 accruing interest at 10 percent per annum payable upon demand. Payment of the note was guaranteed by Hirsch Capital by written guarantee and assignment, dated

November 21, 1983, of its Bank of Virginia Beach Money Market Savings Account No. 50017934.

One week later, on November 28, 1983, Champion, by Hirschfeld, issued a second note payable to the Bank in the amount of $200,000 accruing interest at 10 percent per annum payable upon demand. Payment of this note was guaranteed by Hirsch Capital by written guarantee and assignment, dated November 28, 1983, of its Bank of Virginia Beach Money Market Savings Account No. 50017934.

On January 4, 1984, Champion, by Hirschfeld, issued a third note payable to the Bank in the amount of $100,000, also accruing interest at 10 percent per annum payable upon demand. Payment of this note was guaranteed by Hirsch Capital by written assignment and pledging agreement, dated January 4, 1984, of its Bank of Virginia Beach Money Market Savings Account Number 50017934.

Finally, on January 30, 1984, Champion, by Hirschfeld, issued a fourth note payable to the Bank in the amount of $575,000 accruing interest at 10 percent per annum payable upon demand. Payment of this particular note was guaranteed by Hirsch-Chemie by written assignment and pledging agreement, dated January 30, 1984, of its Bank of Virginia Beach Money Market Savings Account No. 50014773. All of these loans made by the Bank to Champion were fully collateralized either by Hirsch-Chemie or Hirsch Capital's account at the Bank.

On February 14, 1984, the Bank made written demands on Champion (and on Hirsch-Scionic Corp., a subsidiary of Hirsch-Chemie, which also had loans from the Bank) for full payment of all outstanding loans. Written demand for repayment of Champion's $1,475,000 debt to the Bank was served upon Hirschfeld at his offices. On the date of this demand, Champion had only $21,804.46 on deposit in its checking account (Account No. 5006327) and was unable to meet the demand. To effect payment on behalf of Champion, Hirschfeld withdrew funds from the accounts of Hirsch-Chemie and Hirsch Capital, the guarantors of the Champion notes.

The Champion prospectus failed to disclose that the Bank made demand on Champion for full payment of the notes. The prospectus also failed to disclose that Champion was unable to make a payment pursuant to the Bank's demand, and that payment of the $1.4 million in notes was made by Hirschfeld by withdrawing funds from the accounts of Hirsch-Chemie and Hirsch Capital.

### Failure to Disclose Ownership of Champion's Debt

In a section of the Champion prospectus entitled "Certain Transactions," the prospectus states that "On February 14, 1984, all of the Champion notes were assigned and conveyed by the Bank of Virginia Beach to pan Nordic Holdings, a non-affiliated third party" ("pan Nordic").

Hirschfeld learned on or about February 21, 1984, from pan Nordic that the notes had just been conveyed by pan Nordic to a third party. Hirschfeld learned within two weeks of February 21, 1984, that pan Nordic had in fact negotiated the notes to Ottimo, a Swiss company controlled by Hirschfeld's client, Hans Mesmer.

The Champion prospectus states that the note holders have orally agreed to extend $475,000 of the company's outstanding indebtedness for at least fourteen months at deferred interest of 12 percent if only the minimum number of units were sold.

However, the prospectus does not disclose who the note holders are, when, or under what circumstances the extension was granted. In fact, pan Nordic is the entity which orally agreed with Champion to extend the notes. The record also establishes that on March 19, 1984, Ottimo was the holder of the notes. Therefore, the disclosure regarding this oral agreement is false and misleading.

### Failure to Disclose that Champion's Surety Owns 51% of Champion's Shares

By agreement dated November 21, 1983, Hirsch Capital agreed to guarantee loans in

the aggregate sum of up to $1 million to Champion from the Bank. As consideration for such guarantee, the agreement provides in paragraph 3 that:

> ... Surety has been assigned as COLLATERAL all right, title and interest in and to an aggregate of 6,700,000 shares of Champion capital stock owned by non-operating shareholders as listed on Exhibit A hereto, so that in the event of a default in the repayment of the Champion loan to Bank of Virginia Beach necessitating the repayment of said loan by Surety, then Surety will own more than 51% of the 15 million outstanding shares and will be in a position to absolutely control the affairs of Champion.

With regard to this surety agreement, the Champion prospectus states only that:

> All of these loans at Bank of Virginia Beach, aggregating a principal amount of $1,475,000, were guaranteed by Hirsch Capital Corp., a shareholder of the company for a surety fee of 2 percent.

The prospectus fails to state that $575,000 of this outstanding indebtedness was guaranteed by Hirsch-Chemie, a corporation controlled by Hirschfeld.

The prospectus fails to disclose the effect of paragraph 3 of the surety agreement, under which the surety gets more than 51 percent of Champion's stock in the event of a default. In addition, the prospectus fails to disclose that payment on the Champion loan was in fact made by the surety, Hirsch Capital, on February 14, 1984, pursuant to the Bank's demand which Champion could not pay. Finally, the prospectus fails to disclose that by virtue of the February 14, 1984 default by Champion, Hirsch Capital owned at least 51 percent of the shares of Champion pursuant to the Surety Agreement.

### The Likelihood of Further Violations

Defendant Hirschfeld has been enjoined twice from violations of the antifraud provisions of the securities laws. The first order was entered on consent in an action entitled *SEC v. Hirschfeld Bank of Commerce*, No. 74 Civ. 533 (E.D.Va. Feb. 18, 1975). Notwithstanding the fact that Hirschfeld signed the consent order as chairman of the board of the Hirschfeld Bank of Commerce, Hirschfeld contended at trial that he was not enjoined personally from further violating the law. The second consent order, entered in an action entitled *SEC v. Hirschfeld*, No. 76 Civ. 3887 (E.D.Pa. Dec. 21, 1976), named Hirschfeld as a defendant. Hirschfeld did not deny that this order enjoined him from violating the law.

The above-described misrepresentations and omissions by Hirschfeld evidence a knowing and willful scheme to violate the law and thereby prove scienter. This conduct, together with both Hirschfeld's prior actions and his ongoing involvement with public companies, supports a finding that Hirschfeld will continue to violate the law in the future.

### CONCLUSIONS OF LAW

In order to obtain a permanent injunction pursuant to Section 20(b) of the Securities Act of 1933 ("1933 Act") and Section 21(d) of the Securities Exchange Act of 1934 ("1934 Act"), the Commission must demonstrate both that the defendants have engaged in violations of the relevant statutory provisions and that there is, once violations have been established, "a reasonable likelihood of further violation in the future." *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99 (2d Cir.1978); *see also SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir.1979).

To establish a violation of the antifraud provisions of the federal securities laws, specifically Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, there must be a finding that a prospectus filed with the Commission and disseminated to investors or potential investors is "misleading in several material respects." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095 (2d Cir.1972). Materiality is established by a showing of "substantial likelihood that, under all the circumstances,

**534**

the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder, or ... that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Harkavy v. Apparel Indus., Inc.,* 571 F.2d 737, 741 (2d Cir.1978). In addition, to establish a violation of Section 17(a)(1) of the 1933 Act and Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, there must be a finding of scienter. *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The scienter requirement may be satisfied in this Circuit by a showing of recklessness. *IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980).

■ In connection with the offer, purchase and sale of securities to the public, defendants Hirschfeld and Champion knowingly and recklessly filed with the Commission and disseminated and caused to be disseminated to investors and potential investors a prospectus containing materially false and misleading statements, material misrepresentations and omissions of material fact. Therefore, defendants Hirschfeld and Champion have violated Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act and Rule 10b–5 thereunder.

■ Factors that may properly be considered in determining whether an injunction should issue to prevent future violations of the securities laws include "the likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likilihood [sic], because of defendant's professional occupation, that future violations might occur." *SEC v. Universal Major Indus.,* 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

■ Defendant Hirschfeld's knowing and willful conduct in this case, together with his past conduct and ongoing involvement with public companies, demonstrates that there is a reasonable likelihood that Hirschfeld will commit further violations of the antifraud provisions of the federal securities laws in the future. In view of the forthcoming dissolution of Champion, however, there is no reasonable likelihood that defendant Champion will commit further violations of the antifraud provisions of the federal securities laws in the future.

Defendant Hirschfeld should be enjoined from further violations of Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act and Rule 10b–5 thereunder. The complaint is dismissed without prejudice with regard to defendant Champion on the representation that Champion is in the process of being dissolved. In the event Champion is not dissolved by December 31, 1984, the Commission may submit an order vacating the dismissal and entering a permanent injunction against Champion.

Settle order on notice.