SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

FOUNDATION HAI, Holding Protection, Ltd., Robert Rossi, Unifund SAL, Tamanaco Saudi & Gulf Investment Group, and Certain Purchasers of the Common Stock of And Options to Purchase the Common Stock of Rorer Group, Inc., Defendants.

No. 90 CIV. 0277 (SWK).

United States District Court,
S.D. New York.

March 1, 1990.

S.E.C. by Thomas C. Newkirk, Barry R. Goldsmith and Mark Kreitman, Washington, D.C., for plaintiff.

Willkie, Farr & Gallagher by Philippe M. Salomon, New York City, for defendant Unifund SAL.

Samuel Burstyn, Miami, Fla., for defendant Tamanaco Saudi & Gulf Inv. Group.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This is an insider trading action brought by the Securities and Exchange Commission ("SEC") for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. This Court granted a temporary restraining order and expedited discovery. Presently before this Court is the motion of the Securities and Exchange Commission for a preliminary injunction against defendants Unifund SAL ("Unifund") and Tamanaco Saudi & Gulf Investment Group ("Tamanaco"), as well as these defendants' motions to dismiss the complaint on various grounds.

## BACKGROUND

These allegations of insider trading stem largely from circumstantial evidence against Tamanaco and Unifund suggesting that they purchased certain speculative options, and common shares as well, in knowing reliance upon material, non-public information regarding the possible merger of Rorer Group Inc. ("Rorer") and Rhone–Poulenc, S.A. ("Rhone"). According to Rorer's Chairman and Chief Executive Officer, it is a U.S. pharmaceutical company that entered preliminary, confidential merger discussions with Rhone as early as the summer of 1989. Declaration of Robert E. Cawthorn at ¶¶ 2, 3. The understanding of confidentiality was formalized in a confidentiality agreement entered into by Rorer and Rhone in August 1989. Talks progressed with the exchange of financial information in September and further discussion through December, at which time the parties had engaged transactional advisors, including investment bankers and attorneys. *Id.* at ¶ 4. Detailed discussions took place in December and January concerning the price Rhone would pay for Rorer stock and how the merger might be structured. *Id.* at ¶ 6. Rorer's Chief Executive further stated that the Rorer personnel with knowledge of these discussions understood that information concerning the transaction was confidential. *Id.* at ¶ 7.

After providing the French government with a report of the proposed merger on December 22, 1989, Rhone learned from the French government on January 4 that it would formulate a position on the transaction by January 17. Declaration of Yves Brissy at ¶ 6. Rorer publicly disclosed that it was engaged in merger discussions in a January 15, 1990 press release. On January 18, Rorer and Rhone executed a nonbinding Agreement in Principle and issued a joint press release identifying the companies and their merger intentions. Brissy Dec. at ¶ 8.

Defendant Tamanaco is a Panamanian corporation that purchased 500 Rorer option contracts through Campagnie Espirito Santo ("Espirito") on January 10, 1990. On

January 12, Tamanaco purchased 100 call options in the same series through Espirito's account at the Lausanne, Switzerland branch of Dean Witter Reynolds Inc. ("Dean Witter"). On January 10, Espirito also purchased 3000 shares of Rorer Group Inc. common stock at an account with the firm of Raymond James & Associates, Inc. Third Declaration of Thomas B. Lawson at ¶ 2 ("Lawson III"). On January 18, Tamanaco sold the six hundred options it acquired on January 10 and 12 for $167,500, realizing a gross profit of $666,250.

Defendant Unifund was incorporated under Lebanese law in April, 1988 for the purpose of investing in securities and currencies. Affidavit of Ralph Audi, dated February 21, 1990, at ¶ 2. At about this time, Unifund opened a cash management account with the Lebanon subsidiary of Merrill Lynch, which account is carried on the books of Merrill Lynch in New York. Affidavit of Philippe M. Salomon, dated February 12, 1990, at ¶ 15; Affidavit of Antoine J. Merheb, dated February 9, 1990, at ¶ 7. Over the past two years Unifund invested in the securities of firms that were subject to takeover rumors such as United Air Lines, Pillsbury Company, Time Warner Inc., and Polaroid Corp. Merheb Affidavit at ¶ 12. On January 4, 1990, Unifund began acquiring Rorer options and common stock. It spent $1,905,437 to acquire forty thousand Rorer common shares at $47.63 on January 4, and sold these shares on January 16 at $62.25 for a profit of $464,-313. SEC Memorandum in Support at 11. During this period, Unifund purchased April options for $306,987, selling some of these options on January 15 and 16 for a profit of $114,012.50. On these January 1990 transactions in Rorer securities, Unifund realized a profit thus far of approximately $420,000. *See* SEC Memorandum in Support of Preliminary Injunction at 11.

According to the Declaration of SEC attorney James Bennett, Candid Peyer, who was Espirito Santo's broker at Raymond James, admitted in a telephone interview that he had received "inside information"

relating to this takeover from an unnamed friend. Declaration of James B. Bennett at ¶ 6. According to Bennett, Peyer admitted that

> at some point between December 11 and December 21, 1989, a close friend of his told him that 'if you want a Christmas gift, buy February 60 calls in Rorer.' Mr. Peyer said that in his opinion his friend had "inside information" concerning a takeover of Rorer.

Bennett Declaration at ¶ 6. Although Peyer would not identify his friend, he did add that this friend "said the information came from 'the direction' of one of the entities mentioned in connection with the Commission's litigation." *Id.* at ¶ 14.

Unifund's principal holder and bearer of shares, Ralph Audi, has borrowed money from Banque Audi, which is a Lebanese bank located in Beirut and which is managed by distant cousins of Ralph Audi. Letter of Philippe Salomon to the Court dated February 26, 1990, at 4; Translation of C.O.B. Hearing at 5. According to Ralph Audi's statement to the C.O.B., his cousins also "hold interests in Banque Audi France SA, located at 73 Avenue des Champs Elysees, Paris, Banque Audi Suisse, with head office in Zurich and a branch in Geneva, and Banque Audi Inc., with head office in New York." American Stock Exchange records further indicate that the same Banque Audi Suisse also traded in Rorer call options in the week before the announcement. Second Declaration of Mark Kreitman, dated February 27, at ¶ 7. It is noteworthy that Banque Audi Suisse made these trades through the brokerage firm of Raymond James, the firm used by defendant Tamanaco and also the firm which employs Candid Peyer, the broker who admitted knowledge of certain "inside information." *Id.*

The parties appeared before this Court on January 30, 1990 and again on February 13, 1990, at which time this Court orally granted the preliminary injunction with regard to Tamanaco, later signing a written order.[1] After determining that this Court's

---

1. This Court notes that Tamanaco sent local counsel to the February 13 hearing, that local

counsel took the position that Tamanaco had fully argued its position before the Court on

prior order of expedited discovery had not been complied with by the defendants, this Court appointed Alvin K. Hellerstein, Esq., as Special Master "to assist the parties in formulating a discovery plan and to mediate any discovery disputes." *See* Order Appointing Special Master, dated January 31, 1990, at 2. Under the direction of the Special Master, the SEC took depositions in London on February 9. There were, however, no depositions of Tamanaco and Unifund, as neither defendant produced someone with personal knowledge of the Rorer transaction. The SEC contends that Unifund has systematically avoided its discovery obligations, in the face of expedited discovery, while pressing forward for the preliminary injunction hearing. *See* Declaration of Barry R. Goldsmith, dated February 21, 1990. Thus, plaintiff argues that it has been squeezed by Unifund's obstructive discovery tactics. Unifund objects to this characterization, arguing that civil war in the Christian sector of Beruit, Lebanon made it impossible to contact Unifund's principal and provide a witness with personal knowledge for deposition in London on February 9.

Through the mediation of the Special Master all the defendants but Unifund and Tamanaco consented to a sixty day extension of the temporary restraining order for the purpose of consolidating the trial with the preliminary injunction hearing under Fed.R.Civ.P. 65. At that time, Unifund's counsel stated that he could not contact his client to discuss this proposal, and agreed to put the hearing over to February 22 to consider such an extension. Declaration of Barry Goldsmith at ¶ 10. On February 15, counsel for Unifund contacted the SEC and requested that they take the deposition of Ralph Audi, a witness with personal knowledge, prior to the February 22 hearing. The SEC refused to take the deposition in France because it allegedly would take at least one month for it to obtain French government approval. *Id.* at 13. In response, the SEC offered to take the deposition in a mutually agreeable place in North America, such as Montreal or Bermuda,

where foreign government approval would not be an obstacle. This offer was rejected. Unifund's counsel suggested a telephone deposition, but this was rejected by the SEC as inadequate and also because it created similar foreign government approval problems. The Special Master ruled at that time that it would be unreasonable to require the deposition before the hearing either in Europe or the United States under the circumstances. *See* Letter of Alvin Hellerstein to the Court, dated February 16, 1990.

On February 22, this Court heard oral argument on the motion for a preliminary injunction against Unifund. At that time Unifund agreed to continue the temporary restraining order until a time to be determined the week of February 26, 1990. This Court again requested that the parties seek to depose Ralph Audi before the expiration of the temporary restraining order. Through the mediation of the Special Master, Unifund agreed to extend the restraining order until March 1, but no agreement could be reached on an additional deposition. Unifund took the position that "the transcript of examination of Mr. Raphael Audi by a Magistrate of the Audit Department of the French Stock Exchange Transactions Commission constitutes the equivalent of a deposition and that another deposition would be an unreasonable imposition on his client." Letter of Special Master Alvin Hellerstein to the Court, dated February 26, 1990. In contradiction, the SEC contends that it "should not be limited by the transcript of an examination taken by the investigative offices of another government, and that it has not yet had a reasonable opportunity to conduct its own examination." *Id.* The SEC also argues that the depositions submitted by Mr. Audi, Mr. Merheb and Mr. Salomon are not reliable in the absence of a deposition of Mr. Audi. The Court concludes that the SEC should have an independent opportunity to depose Mr. Audi, and that the presence of a prior C.O.B. interview does not preclude the SEC from taking its discovery. Although the Court has considered defendant Unifund's

January 30, and therefore, it chose not to partic-

ipate in oral argument.

affidavits, it has done so in light of plaintiff's lack of opportunity to depose someone with personal knowledge at Unifund.

## DISCUSSION

### 1. Personal Jurisdiction

 The Securities and Exchange Act extends personal jurisdiction to the full reach allowed under the due process clause of the Fifth Amendment. *See, e.g., Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 998 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1339 (2d Cir.1972). The Supreme Court recently considered the Constitutional limit placed on personal jurisdiction by the due process clause, holding that Constitutionally sufficient minimum contacts between defendant and forum "come about by an action of the defendant purposefully directed toward the forum State." *Asahi Metal Industries v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *see also Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The Supreme Court in *Asahi* further explained that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum ..." *Id.* The Court concludes that Tamanaco and Unifund have taken purposeful action directed toward the United States, and that any effects of this action in the United States are foreseeable. First, this action is based on trades of options effected by each defendant through foreign offices of American broker-dealers registered with the Securities and Exchange Commission. Second, the options and common stock traded here are the securities of Rorer, a United States corporation domiciled in Pennsylvania. Third, the options at issue are traded exclusively on the American Stock Exchange, and therefore, it would be foreseeable that any brokerage would send the buy order to the American Stock Exchange for execu-

tion, as was done here. Finally, all option purchases such as these are cleared through the Options Clearing Corporation, which is also a U.S. entity. Declaration of Howard Kramer at ¶ 3. Based on the purposeful acts of defendants in executing these trades as they did, along with the clear foreseeability of their effect in the United States, this Court has personal jurisdiction over defendants Tamanaco and Unifund.[2]

### 2. Adequacy of Service

#### a) *Tamanaco*

Tamanaco claimed that it had not received actual notice as of February 6, 1990, but this claim is not convincing. First, Tamanaco has provided no affidavit or affirmation on personal knowledge supporting its contention that it has not received actual notice. Furthermore, the procedural history of this action belies Tamanaco's suggestion that it has not received actual notice. Its counsel has appeared before this Court, fully cognizant of the nature of this action, and has participated in argument. On January 18, 1990, the SEC delivered the complaint, temporary restraining order and other court papers by overnight courier to the Swiss police. The Swiss police then delivered them to Espirito, which is the Swiss bank through which Tamanaco placed its order for Rorer options. First Declaration of Ellen B. Ross at ¶ 7. After learning Tamanaco's identity on January 30, 1990, the SEC served court papers on Tamanaco's attorney. Third Bennett Declaration at ¶ 5.

 Tamanaco contends that the Court-authorized form of service employed in this case did not comply with Fed.R.Civ.P. 4, and was in violation of due process. *See, e.g., Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The temporary restraining order dated January 17, 1990 provided as an alternate means of service that all pleadings could be served upon each defen-

---

**2.** As Rorer's call options were purchased on the American Stock Exchange in New York, venue lies in this district under section 27 of the Exchange Act, which provides for venue in forums where an act or transaction constituting a violation of the securities laws takes place.

dant's broker as agents for the foreign defendants. T.R.O. at ¶ VIII B. The SEC argues that this Court-authorized form of service was valid as service upon a defendant's agent, as permitted under Fed.R. Civ.P. 4(i), or alternatively, that the method of service complies with the provisions of Court authorized alternate service under Fed.R.Civ.P. 4(e). Rule 4(e) provides

> Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order ...

Fed.R.Civ.P. 4(e). As the form of service on this foreign defendant was authorized by the January 17 order of this Court, it falls under Rule 4(e).[3]

Tamanaco attacks service on due process grounds, arguing that it does not comport with *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). In *Mennonite,* the Supreme Court held that an Indiana statute permitting posting and publishing announcements of real property tax sales violated the due process clause. The *Mennonite* Court recognized that mortgagees have a legally protected property right, the value of which could be severely diminished or eliminated by a tax sale. Due process, therefore, required that the mortgagee receive "notice reasonably calculated to apprise him of a pending sale." *Mennonite, supra,* 462 U.S. at 798, 103 S.Ct. at 2711. In *Mennonite,* however, the mortgagee's name and state of incorporation was filed with the County Recorder, and the Court concluded that its address could have been ascertained by reasonably diligent efforts. *Id.* at 798 n. 4, 103 S.Ct. at 2711 n. 4 (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652,

658, 94 L.Ed. 865 (1950)). By contrast, the identity of defendant Tamanaco, let alone its address, remained unknown to the SEC and this Court until the Court insisted that defendant's counsel disclose his client's name on January 30, 1990. In another case involving foreign defendants similarly sued under section 10(b) for insider trading, the Second Circuit held that mere notice by publication in all editions of the "International Herald Tribune" over a four week period was adequate. *S.E.C. v. Tome,* 833 F.2d 1086 (2d Cir.1987), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). The Second Circuit also noted that "as business dealings have become increasingly interstate and international, the means of giving notice have been extended to meet these situations, so that parties may be held accountable in our courts of justice." *Id.* at 1092. In this action, the notice authorized by this Court was more direct, less attenuated, and even more calculated "to apprise interested parties of the pendency of the action and afford them an opportunity to be heard." *Id.* at 1093 (quoting *Mullane, supra,* 339 U.S. at 314, 70 S.Ct. at 657). Therefore, service on the U.S. brokerage firm in this case comports with due process.

b) *Unifund*

Circumstances strongly suggest that Unifund has received actual notice of this proceeding, that it has been apprised of the SEC's allegations, and that its principal is involved to some extent in the defense of this action. The SEC served court papers by overnight courier on Merrill Lynch as agent for Unifund on January 18, 1990. First Ross Declaration at ¶ 5; Kaminsky Declaration at ¶ 6. A broker employed by Merrill Lynch with responsibility for the Unifund account, Riyad Salame, confirmed that these papers were then forwarded to Unifund. Kaminsky Declaration at ¶ 6. Furthermore, Nicolas Chedid, Unifund's

---

**3.** Even though Fed.R.Civ.P. 4(i) provides alternate provisions for service in a foreign country, this Court has permitted service under this Rule through an intermediary or agent in the forum state. *See, e.g., Levin v. Ruby Trading Corporation,* 248 F.Supp. 537, 541 (S.D.N.Y.1965) (Weinstein, J.) (service upon attorneys of defendant, as its agent, pursuant to Fed.R.Civ.P. 4(i)(1)(E) which permits service as authorized by the Court). Consequently, service effectuated through Espirito Santo was not inconsistent with Rule 4(i)(1)(E).

Chairman, told its broker at Merrill Lynch that he had received these papers by overnight mail. *Id.* According to Mr. Salame, Mr. Chedid had requested that Mr. Salame also give copies of the court papers to a French attorney in Paris that represents Unifund SAL. The French attorney then received these papers from Merrill Lynch's Paris office. *Id.* at ¶ 8.

Unifund argues that due process requires that the SEC at least mail the court papers to it directly, as its name and address were known. It appears, however, that Nicholas Chedid actually received the court papers through overnight mail. In light of the problems in this case in serving numerous foreign defendants with limited operations in the United States except for their brokerage contacts, the SEC's method of using the foreign defendants' U.S. brokerages was well calculated "to apprise interested parties of the pendency of the action and afford them an opportunity to be heard." *Id.* at 1093 (quoting *Mullane, supra,* 339 U.S. at 314, 70 S.Ct. at 657). Based on the above analysis, this Court does not find that the Court authorized service of Unifund violated either the Federal Rules of Civil Procedure or the due process clause.[4]

### 3. Preliminary Injunction

■ To be entitled to a preliminary injunction, the SEC must demonstrate (1) a strong *prima facie* case of previous violations of section 10(b) of the 1934 Act, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975); *SEC v. Vaskevitch,* 657 F.Supp. 312, 315 (S.D.N.Y.1987); *SEC v. Musella,* 578 F.Supp. 425, 434 (S.D.N.Y.1984) (citing *SEC v. Boren,* 283 F.2d 312, 313 (2d Cir. 1960). This is a special standard that does not required the SEC to demonstrate irreparable injury or lack of a legal remedy. *Musella, supra,* 578 F.Supp. at 434 (citing

*SEC v. Scott,* 565 F.Supp. 1513, 1536 (S.D. N.Y.1983), *aff'd sub nom., SEC v. Cayman Islands Reinsurance Corp.,* 734 F.2d 118 (2d Cir.1984)).

### a) *Prima Facie Case*

■ The SEC argues that the facts developed through only very limited discovery, as well as inferences to be drawn from defendants' alleged stonewalling tactics, create a strong *prima facie* case of violations of Section 10(b) of the Securities Exchange Act and Rule 10b–5. Under the SEC's theory of liability, these defendants are tippees who received misappropriated material non-public information and traded on this information, knowing or having reason to know that such information was misappropriated. *See, e.g., United States v. Carpenter,* 791 F.2d 1024 (2d Cir.1986) (reporter breached duty to newspaper by misappropriating material non-public information concerning subject matter of future Wall Street Journal articles), *aff'd by an equally divided court,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Newman,* 664 F.2d 12 (2d Cir. 1981), *aff'd after remand,* 722 F.2d 729, *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

In support of its *prima facie* case, the SEC relies first on circumstantial evidence of extraordinary trading activity immediately before the public announcement of the potential merger, as set forth above. Significantly, there has been a partial admission of the use of "inside information" by a broker at Raymond James & Associates, Inc, the firm through which Tamanaco traded. *See* First Declaration of James B. Bennett. SEC attorney James Bennett has stated that Espirito Santo's broker at Raymond James, Candid Peyer, admitted in a telephone interview that he had received "inside information" relating to this takeover from an unnamed friend. Declaration of James B. Bennett at ¶ 6. After termi-

---

4. Defendants also have moved to dismiss the complaint under Fed.R.Civ.P. 9(b). The evidence before this Court with respect to these defendants would more than likely satisfy the particularity requirement of the rule, and therefore, this Court defers ruling on this motion

until the parties discuss how the complaint might be amended to avoid unnecessary motion practice. If necessary, the Court shall consider the Rule 9(b) motion after the complaint has been amended.

nating the conversation, consulting a Raymond James compliance officer, and then resuming the conversation with the SEC, Mr. Peyer modified his statement. He then said simply that he believed that his friend's tip was based on inside information because the stock continued to go up in price. *Id.* at ¶ 8. Peyer merely identified this tipper as a friend, approximately fifty-five years old, and who has experience in the industry. *Id.* at ¶ 9. Peyer refused to identify him further. Moreover, Mr. Peyer's unidentified friend told him that this information "came from 'the direction' of one of the entities mentioned in connection with the Commission's litigation." *Id.* at ¶ 14.

This significant admission also relates to the SEC's case against Unifund. Unifund's principal holder and bearer of shares, Ralph Audi, has borrowed money from Banque Audi and is related to individuals who run that bank. *See* Letter of Philippe Salomon to the Court dated February 26, 1990, at 4; Translation of C.O.B. Hearing at 5. American Stock Exchange records demonstrate that Banque Audi Suisse also traded in Rorer call options during the week before the announcement, and did so through the Raymond James brokerage. *See* Second Declaration of Mark Kreitman, dated February 27, at ¶ 7. According to Ralph Audi's statement to the C.O.B., his cousins also "hold interests in Banque Audi France SA, ... Banque Audi Suisse, ... and Banque Audi Inc....." According to the Rand McNally Bankers Directory (International), George W. Audi serves as Chairman of the Board and General Manager of Banque Audi, while Raymond W. Audi acts as Director of Banque Audi. Second Declaration of Mark Kreitman at ¶ 8.

In addition to this connection between Unifund and Raymond James, the SEC recently suggested that Unifund may have additional ties with Banque Audi that have not been more fully ascertained because of the lack of discovery in this action. Raymond Audi, the distant cousin of Ralph Audi, was identified in a December 1, 1987 article of "The American Banker" as the Chairman of Banque Audi Suisse, which is the division of Banque Audi that traded Rorer securities through Raymond James. *Id.* Furthermore, another Banque Audi officer shares the surname as one of Unifund's primary shareholders. The Bankers Directory identified Jean A. Karam as Assistant General Manager of Banque Audi, while Ralph Audi has identified Miss Gladys Karam as one of Unifund's shareholders with signatory authority at Banque de la Mediterenee. While this new evidence has not been further corroborated and has limited weight by itself, it does suggest a significant personal relationship between principals of Unifund and Banque Audi.

A potential connection also has been suggested between Unifund and Rhone by virtue of individuals sharing a common surname. The Court notes with interest that the Rhone–Poulenc executive responsible for promotion in the Near and Middle East is named Amer Khoury. *See* Second Declaration of Mark Kreitman, dated February 27, at ¶ 9. In his C.O.B. interview, Ralph Audi stated that Unifund "was founded by my attorney, Farid El Khoury, Esq., a Beirut attorney." Translation of C.O.B. Hearing at 3. Once again, this evidence itself is not strongly probative of insider trading. Nevertheless, this coincidence suggests a personal connection between the creator of Unifund and legal confidant of Ralph Audi on one hand, and an insider of Rhone on the other. Combined with Unifund's timely trading and its connections with Banque Audi, this new evidence supports a strong inference that Unifund had access to material non-public information regarding the merger prior to the time it began to trade. This inference is also supported with regard to Tamanaco by Peyer's admission of inside information, the considerable trading beginning on January 10, 1990, and Tamanaco's clear failure to take part in the expedited discovery ordered by this Court.[5]

---

5. The Court again notes that the name and address of the Tamanaco defendant were withheld from the SEC and the Court until this Court ordered its attorney on January 30, 1990 to make such disclosure.

The Court does not credit Unifund's explanation for the trades. Ralph Audi stated that he was required to further collateralize a line of credit at his bank, and chose to do so by purchasing Unifund common stock merely because that stock "came to mind." Affidavit of Ralph Audi, dated February 21, at ¶¶ 19–21. Although Mr. Audi contends that Rorer had been a speculated takeover target since August, *id.* at ¶ 16, he was also advised in December by his broker that Rorer was priced too high and was not a good investment. *Id.* at ¶ 18. Unifund does have a history of buying stocks on takeover rumors, yet it did not purchase this stock in August when these rumors allegedly first arose; instead it did so shortly after it had been advised not to buy by its broker.

At this stage, the SEC is required to demonstrate a *prima facie* case, which may be based either on direct evidence or credible circumstantial evidence.[6] The sudden and timely interest these defendants had in Rorer securities is suspicious and has not been adequately explained. The suspicious timing and speculative nature of Unifund's investment further supports the inference that it was acting on material non-public information, as does its connection with Banque Audi and its potential relationship with Rhone.

In the case of Tamanaco, which executed its trades through Raymond James, the admissions of Mr. Peyer combined with the highly suspicious trading pattern support a finding that Tamanaco also acted on material non-public information when it made a large, speculative investment in Rorer just prior to the public announcement of a potential merger.

Based on the foregoing, this Court concludes that the SEC has shown a strong *prima facie* case of violations of Rule 10b–5 with respect to both of these defendants.

**b) *Likelihood of Repetition***

Evidence of activity in the securities markets can weigh strongly in support of a finding that an opportunity for additional violations exists, and that there is a reasonable likelihood of future violations. *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977) ("*U.M.I.*"); *see also S.E.C. v. Champion Sports Management*, 599 F.Supp. 527, 534 (S.D.N.Y.1984) (relevant factors to be considered include (1) likelihood of future violations, (2) degree of scienter involved, (3) sincerity of defendant's assurances against future violations, (4) isolated or recurrent nature of infraction, (5) defendant's recognition of wrongful nature of his conduct, and (6) likelihood, because of defendant's professional occupation, that future violations might occur).

In that *U.M.I.*, defendant Homans was general counsel of defendant Universal Major Industries ("U.M.I."), a petroleum exploration operation which was privately placing debentures in order to raise capital. The S.E.C. obtained a permanent injunction against violations of securities laws, and Homans appealed. He argued, *inter alia*, that there could be no "reasonable likelihood that the wrong would be repeated," because he had "ceased his association with U.M.I. over three years ago and ... the SEC has not even suspected him of illegal activity since that time." *Id.* The Second Circuit rejected this argument and upheld this Court's exercise of discretion under those circumstances, despite his dissociation from U.M.I. three years prior.

Here, the potential for future violations is even stronger. Unifund and Tamanaco are in the business of regularly trading securities. Moreover, the record shows that Unifund has been an active participant in the U.S. securities market.[7] Unlike in *U.M.I.*, there has been no suggestion by either of these parties that they intend to

---

6. For example, the only evidence of scienter is often circumstantial. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983).

7. Although similar information is not available about Tamanaco's involvement with the American securities market, this dearth is due solely to that company's evasion of this Court's discovery orders.

cease their stock trading activities. *A fortiori*, the opportunity for these active stock-trading companies to engage in practices resembling those at issue here is clearly present. This Court finds this situation to be sufficiently dangerous to warrant the imposition of an injunction as to both these defendants.[8]

## CONCLUSION

For the aforementioned reasons, plaintiff's motion for a preliminary injunction, freeze order and an order preventing the destruction or alteration of documents is granted, while the motions of Unifund and Tamanaco to dismiss for lack of personal jurisdiction and for insufficiency of process and insufficiency of service of process are denied.

SO ORDERED.

---

**8.** Unifund contends that the freeze order is excessive, as it applies to the entire cash value of the trading account—approximately $3.7 million—not merely Unifund's trading profits of $1.36 million. While this preliminary injunction continues the freeze to the extent of the temporary restraining order, this is subject to modification. With this in mind, the Court first orders that the parties immediately attempt to agree on the amount of funds that should be frozen. If these discussions are not successful, the plaintiff should file a response to this issue within ten days of this opinion.