**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**UNIFUND SAL and Tamanaco Saudi & Gulf Investment Group, Defendants–Appellants,**

**Fondation Hai, Holding Protection, Ltd., Robert Rossi, and Certain Purchasers of the Common Stock and Options to Purchase the Common Stock of Rorer Group, Inc., Defendants.**

Nos. 1308, 1318, 1319, 1430, Dockets 90–6093, 90–6057, 90–6091, 90–6103.

United States Court of Appeals, Second Circuit.

Argued April 27, 1990.

Decided Aug. 3, 1990.

Phillippe M. Salomon, New York City (Willkie Farr & Gallagher, New York City, on the brief), for defendant-appellant Unifund SAL.

Pamela W. Weiss, Miami, Fla. (Samuel I. Burstyn, Miami, Fla., on the brief), for defendant-appellant Tamanaco Saudi & Gulf Investment Group.

Thomas L. Riesenberg, Asst. Gen. Counsel, Securities & Exchange Comm'n, Washington, D.C. (Paul Gonson, Solicitor, Daniel L. Goelzer, Gen. Counsel, Phillip D. Parker, Assoc. Gen. Counsel, Joseph A. Franco, Susan Nash, Rada L. Potts, Securities & Exchange Comm'n, Wash., D.C., on the brief), for plaintiff-appellee.

Before VAN GRAAFEILAND, NEWMAN and KEARSE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This is an appeal by two securities purchasers from a preliminary injunction obtained by the Securities and Exchange Commission in a case of alleged insider trading. This case is unusual in that, as the Commission acknowledged at oral argument, it is the first insider trading case in which the Commission has sought relief against alleged tippees before identifying the alleged tipper. Unifund SAL ("Unifund") and Tamanaco Saudi & Gulf Investment Group ("Tamanaco") appeal, respectively, from the March 1 and February 14, 1990, orders of the District Court for the Southern District of New York (Shirley Wohl Kram, Judge) granting a preliminary injunction at the request of the Commission. The injunction (a) prohibits violation of section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b) (1988), and rule 10b–5, 17 C.F.R. § 240.10b–5 (1989), (b) freezes appellants' accounts, subject to trading approved by the Commission, and (c) bars disposal or alteration of appellants' books and records. Appellants challenge the injunction for lack of personal jurisdiction, improper service, improper procedure in conducting the injunction hearing, and insufficient evidence to warrant any relief. We affirm, with modifications, the injunction to the extent that it freezes accounts and preserves records, and vacate the prohibition on future violations as insufficiently supported.

## Background

The case concerns trading in the stock and stock options of Rorer Group, Inc.

("Rorer"), a United States pharmaceutical company incorporated in Pennsylvania. Rorer common stock is listed on the New York Stock Exchange, and option contracts for its common stock are listed on the American Stock Exchange. In the summer of 1989, Rorer began confidential merger negotiations with Rhone–Poulenc, S.A. ("Rhone"), a French corporation. The discussions intensified in December and in early January 1990. In mid-January, prior to any public announcement of merger negotiations, massive trading occurred in Rorer stock and options. On January 12 the volume of shares traded was six times the average daily volume of the previous 20 days. On January 10 the volume of options traded doubled from the prior day, doubled again on January 11, and on January 12 reached nearly ten times the average daily volume in the prior month.

Reacting to the trading volume, officials of Rorer and Rhone accelerated their negotiations, and on January 15 Rorer announced that it had engaged in merger discussions with an unidentified company. On that day Rorer stock rose from $52 a share to $63 a share. An agreement in principle to merge with Rhone was announced three days later.

The heavy trading volume prompted the Commission to investigate. It quickly identified unusually large Rorer stock and option transactions in brokerage accounts maintained by foreign investors, including appellants Unifund and Tamanaco. Unifund is an investment company based in Lebanon and incorporated under Lebanese law. Tamanaco is an investment company incorporated in Panama. On January 4 Unifund purchased 40,000 shares of Rorer for approximately $2 million through the Beirut office of Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). From January 4 through 12 it bought 810 Rorer call option contracts for approximately $300,000. After the merger announcement, Unifund liquidated its position, making $564,000 on the stock and $980,000 on the options. On January 10, Tamanaco

purchased 500 Rorer call options for approximately $150,000 through Compagnie Financiere Esperito Santo ("Esperito Santo"), a Swiss bank in Lausanne. Two days later Tamanaco bought an additional 100 call options through the same bank. The purchases were made through Esperito Santo's account at the Lausanne branch of Dean Witter Reynolds Inc. ("Dean Witter"). Within one week the value of the options quadrupled, producing a profit of approximately $660,000.

On January 17, two days after the merger announcement, the Commission filed this lawsuit against Unifund and other purchasers of Rorer stock and obtained a temporary restraining order. Tamanaco had not yet been identified as the name of one of the purchasers. The TRO barred future violations of section 10(b) and rule 10b–5, required retention of unsold Rorer stock and options as well as the proceeds from those securities that had already been sold, and froze defendants' accounts. The TRO permitted trading in Rorer options and in the frozen accounts with the Commission's permission. The January 17 order also provided for expedited discovery and for service by various means, including mailing or overnight courier delivery to defendants or their banks and brokers as agents. The Commission served Unifund by sending the complaint and the TRO by overnight courier to Merrill Lynch in New York for forwarding to Unifund in Beirut. A Unifund official later confirmed receipt of the papers from Merrill Lynch.[1]

On January 30, at what was to have been a hearing on a motion for a preliminary injunction, all defendants except Tamanaco agreed to a ten-day extension of the TRO. Tamanaco insisted on going forward in defense of the SEC's motion for a preliminary injunction. At this time, Tamanaco identified itself as one of the purchasers. After hearing argument, Judge Kram reserved decision as to Tamanaco and, by order entered February 2, extended the TRO against all defendants until February 14.

---

1. Tamanaco, which does not challenge service of process, was similarly served through its bro-
ker, Dean Witter.

The District Court also appointed a special master to supervise discovery. Though the parties accuse each other of responsibility for the ensuing difficulties in arranging for discovery, it is clear at least that the special master entered an order requiring Unifund and Tamanaco each to produce in London on February 9 an official who could testify to the company's trading in Rorer securities and that neither company complied with this requirement.

On February 9, the Commission renewed its request for a preliminary injunction and sought a hearing for February 13. The Commission and Unifund agreed to postpone the hearing and to continue the TRO until February 22. Tamanaco objected to any further hearing, contending that the record in support of a preliminary injunction against it could not be expanded beyond the evidence presented on January 30. The District Court disagreed. The Commission then presented evidence concerning Tamanaco; Tamanaco declined to offer evidence. On February 14, the District Court granted the preliminary injunction against Tamanaco and, following further hearings, entered a similar injunction against Unifund on March 1.

In an opinion dated March 2, Judge Kram detailed the basis for issuing the injunction. Rejecting the challenge to personal jurisdiction, the District Judge ruled that the required contacts with the United States were established by the following facts: (a) the options were traded through foreign offices of American broker dealers, (b) Rorer is a United States corporation, (c) Rorer options are traded exclusively on the American Stock Exchange, and (d) the option purchases are cleared through the Options Clearing Corporation, a United States company. These factors, the Court concluded, demonstrated that the defendants executed their trades with "the clear foreseeability of their effect in the United States." The Court also rejected Unifund's challenge to the service of process that had been made through the New York office of Merrill Lynch. 736 F.Supp. 465.

On the merits, Judge Kram stated that the standard for a preliminary injunction requested by the Commission is a strong *prima facie* case of a violation of section 10(b) and a reasonable likelihood that the wrong will be repeated. She found this standard met by various items of circumstantial evidence. Initially, she relied on the unusual trading activity in Rorer securities by Tamanaco and Unifund. There was evidence that in the Espirito Santo account at Dean Witter in Lausanne, through which the Tamanaco's Rorer options had been purchased, no other options had been traded since August 1989. Unifund's January 4 purchase of 40,000 Rorer shares represented 13 percent of the total Rorer shares traded that day. Unifund's stock purchase was nearly twice the size of its next largest investment in any company, even when those investments were aggregated over time. Moreover, its prior equity positions had been partially hedged, but its position in Rorer was not.

To show that the purchases were based on inside information, Judge Kram relied on the following circumstances. On January 10, 1990, Espirito Santo, through which Tamanaco purchased its Rorer options, purchased 3,000 shares of Rorer through the Nyon, Switzerland, office of Raymond Jones & Associates, Inc. ("Raymond Jones"), stockbrokers based in Tampa, Florida.[2] Espirito Santo's broker at Raymond Jones, Candid Peyer, told Commission investigators in a telephone interview that in mid-December 1989 a close friend, identified only as an independent money manager in Geneva, had told him that "if you want a Christmas gift, buy February 60 calls in Rorer." Peyer said that in his opinion his friend had "inside information" concerning a takeover of Rorer. Peyer said his friend received the information from an unnamed stockbroker at a Canadian brokerage firm in Lausanne. After a pause in the interview, during which Peyer consulted with a Raymond Jones compliance officer, Peyer said he thought the recommendation was based on inside infor-

---

**2.** The Commission represented that it had "reason to believe" that these shares were purchased for Tamanaco, but Judge Kram made no finding on this point.

mation because the price of Rorer stock continued to go up. In a subsequent interview after the lawsuit was filed, Peyer revealed that his friend had said that the information came from "the direction" of one of the entities mentioned in connection with the lawsuit.

Judge Kram found that the Peyer "admission" was pertinent not only to Tamanaco but also to Unifund. As the link to Unifund, she pointed to Bank Audi, a Lebanese bank. The connection Judge Kram relied upon was that Ralph Audi, the principal shareholder of Unifund, is related to individuals who run Bank Audi and its Swiss affiliate, Bank Audi Suisse, and that Bank Audi Suisse had purchased Rorer call options in the week prior to the merger announcement and had made the purchases through Raymond Jones, the brokerage firm that employed Candid Peyer. Ralph Audi's relatives,[3] George W. Audi and Raymond W. Audi, are, respectively, chairman and director of Bank Audi; Raymond is also chairman of Bank Audi Suisse. Ralph Audi has borrowed funds from Bank Audi. Judge Kram also noted that another Bank Audi officer, Jean A. Karam, has the same surname as a Unifund shareholder, Gladys Karam. Judge Kram acknowledged that this fact "has limited weight by itself."

The District Judge found a "potential connection" between Unifund and Rhone, the acquirer of Rorer, through yet another matching of surnames. Judge Kram noted "with interest" that the Rhone executive responsible for promotion in the Near and Middle East is Amer Khoury and that Ralph Audi had told French authorities that Unifund was "founded by my attorney, Farid El Khoury, Esq., a Beirut attorney." Judge Kram concluded:

> Once again, this evidence itself is not strongly probative of insider trading. Nevertheless, this coincidence suggests a personal connection between the creator of Unifund and legal confidant of Ralph Audi on one hand, and an insider of Rhone on the other. Combined with Unifund's timely trading and its connection

with Bank Audi, this new evidence supports a strong inference that Unifund had access to material non-public information regarding the merger prior to the time it began to trade.

Judge Kram explicitly declined to credit Unifund's innocent explanation for its Rorer purchases. In an affidavit, Ralph Audi stated that Unifund frequently invests in possible takeover targets, that Rorer had been the subject of takeover speculation since August 1989, that his bank in Paris had informed him in the last week of December that additional collateral was needed to secure Unifund's line of credit, and that the "first stock that came to mind for me was Rorer," because of the prior takeover rumors. Judge Kram found this explanation unconvincing because Audi had not bought Rorer in August, when he claims to have first heard takeover rumors, but did so on January 4, 1990, just after Merrill Lynch had advised against a purchase in December.

Having found a "strong *prima facie*" case of rule 10b–5 violations by both Unifund and Tamanaco, Judge Kram also found a sufficient likelihood of future violations, a conclusion based primarily on the fact that both defendants regularly trade securities. She therefore issued the preliminary injunction.

## Discussion

Both sides warn us that a ruling adverse to their positions will have dire consequences for the flow of foreign capital into American securities markets. For their part, appellants contend that if the injunction is upheld, foreign investors will not enter American capital markets for fear of having their accounts frozen on thin allegations of insider trading. For its part, the Commission contends that if the injunction is vacated, foreign investors will shun American capital markets for lack of assurance that insider trading is being adequately policed. Even with appropriate discount of litigating hyperbole, these claims take the market in *in terrorem* argumentation

---

**3.** Judge Kram described the relatives as Ralph Audi's cousins. In his statement to French au-

thorities, he described them as sons of his brothers, *i.e.,* his nephews.

to new highs. We think the decision of foreign investors to trade in American securities will be influenced far more by the prospect of making money than by either the risk that a trading account will occasionally be frozen or the risk that an insider trading violation will not be remedied until a plenary trial. In any event, our concern is whether personal jurisdiction exists, whether process was valid, whether proper procedures were followed in conducting the injunction hearing, and whether the standards for a preliminary injunction have been sufficiently met to justify both the prohibition on future violations and the freeze order.

## I. Personal Jurisdiction

■ Since the Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment, *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir.1972), the personal jurisdiction challenge raised by Unifund must be tested against due process standards. Those standards permit the exercise of jurisdiction over a defendant whose "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). One circumstance making such anticipation reasonable is where a defendant·has acted in such a way as to have "caused consequences" in the forum state, *see Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d at 1340; *Restatement (Second) of Conflict of Laws* § 37 (1989).

Though not every causal connection between action abroad and ultimate injury to American investors will suffice, *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 1000 ("even assuming ... some causal relation ... the test for *in personam* jurisdiction is somewhat more demanding"), Unifund's transactions are alleged to have had a rather direct and an unmistakably foreseeable

effect within the United States. It is alleged to have traded, on the basis of inside information, options of a United States corporation listed exclusively on a United States stock exchange. That activity created the near certainty that United States shareholders, who could reasonably be expected to hold Rorer securities, would be adversely affected. The causal relationship is far more direct than in *Bersch*. In that case we said there was no basis for believing that a Canadian brokerage firm had knowledge that some United States citizens would purchase shares of the Bahamian subsidiary of a Canadian corporation where the prospectus represented that the shares would not be offered in the United States. *Id.* at 980, 1000.

Unifund contends that assertion of jurisdiction over it would lead to a similar result in virtually every instance where a foreigner trades securities of a United States company or has an account with a foreign affiliate of a United States brokerage firm. We disagree. Not every securities law violation involving shares of a United States corporation will have the requisite effect within the United States. Insider trading, however, has serious effects that can reasonably be expected to be visited upon United States shareholders where, as here, the securities are those of a United States company traded exclusively on a United States exchange. The fact that the trades were made through the foreign affiliate of a United States broker adds one slight point of contact with the United States, but we are not ruling that use of a branch office of a United States brokerage firm automatically suffices to support personal jurisdiction.

## II. Service of Process

■ Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (1988), authorizes service of process "wherever the defendant may be found." The District Court's order of January 17 authorized service upon defendants by use of overnight courier and also permitted service upon their brokers as agents. The Commission sent all relevant papers by overnight couri-

er to Unifund in care of the New York office of Merrill Lynch with instructions to forward the papers by overnight courier to Unifund in Beirut. The papers were delivered to Merrill Lynch and forwarded to Beirut, where they were received by Unifund.

Judge Kram ruled that service was proper under either rule 4(e) or rule 4(i) of the Federal Rules of Civil Procedure. Rule 4(e) provides:

> Whenever a statute of the United States or an order of court thereunder provides for service of a summons ... upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order....

Fed.R.Civ.P. 4(e). Judge Kram ruled that service was proper since it conformed to the requirements of the January 17 order.

Unifund's initial challenge to the sufficiency of process is that the January 17 order, authorizing a particular means of service, was not made "under" section 27 of the Exchange Act because section 27 does not specify any method of service. The statute makes clear that a person not found within the state in which the district court sits is amenable to process but is silent as to method of service upon such a person. Rule 4(e) was amended in 1963 to include, among other additions, the word "thereunder" and the clause "or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule." The Advisory Committee's note explains that the word "thereunder" supports the drafters' original view that the order of the court specifying means of service "must be authorized by a specific United States statute." It is arguable that rule 4(e) permits a court to select a means of service whenever a federal statute authorizes extraterritorial service, as section 27 does, whether or not the statute specifies method of service. However, Professor Moore believes that rule 4(e) authorizes a district court to fill in the details of service only as to a method authorized in a federal statute and that where the federal statute

is silent as to method, "service should be made in the manner prescribed by *other* appropriate provisions of Rule 4." 2 *Moore's Federal Practice* ¶ 4.32[1], at 4–266 (2d ed. 1989) (emphasis added).

Even if Professor Moore is right, Unifund's objection to service simply shifts the inquiry from rule 4(e) to rule 4(i), since the latter provision explicitly provides that where service is permitted on a defendant not found in the relevant state, service in a foreign country may be made by various means, including "as directed by order of the court."

Unifund also contends that process was invalid under rule 4(i) since that provision applies only to service upon parties "in a foreign country" and provides no legal basis for service in the state in which the District Court sits. Whether or not that contention is sound, it is irrelevant to this case. Though process was initially delivered to Merrill Lynch in New York, it was forwarded to Unifund in Beirut. Unifund's acknowledged receipt of that process renders service effective as having been completed in a foreign country. Judge Kram permissibly relied on *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537, 541 (S.D.N.Y. 1965), for the proposition that service abroad may be made through an intermediary located in this country.

### III. Tamanaco's Procedural Objections

■ Tamanaco advances two procedural objections to the orders entered against it. First, it contends that since the January 17 TRO expired on January 31 (after ten business days), the order of February 2, purporting to extend the TRO for an additional ten days was invalid because it was entered after the January 30 hearing on the preliminary injunction and because it was not entered within the ten-day period of the original TRO. The first point is frivolous; nothing in rule 65 of the Federal Rules of Civil Procedure prevents a district court from continuing a TRO while reserving decision on a motion for a preliminary injunction. The second point, concerning late entry of the TRO extension, appears to be correct, *see* Fed.R.Civ.P. 65(b) (TRO may be

extended "within the time" of the original order), but has no relevance. The validity of the TRO extension would be pertinent if Tamanaco had been held in contempt for its violation; otherwise, any defect in the TRO has been rendered moot by issuance of the February 14 preliminary injunction. *See Glen–Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1030 (2d Cir.1974).

Next Tamanaco contends that Judge Kram lacked authority to issue the February 14 preliminary injunction because the February 2 order, not being a validly extended TRO, was in effect the grant of a preliminary injunction. *Cf. Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). Judge Kram clearly thought that her February 2 order was an extension of the TRO. The order states that "it is necessary to extend this temporary restraining order for an additional ten (10) business days pursuant to Fed.R.Civ.P. 65(b). This order is effective upon the expiration of the January 17th order to ensure that the temporary restraining order has remained continuously in effect." Even if the February 2 order technically qualified as a preliminary injunction, we think that under the circumstances the only consequence of considering the order to be an injunction rather than a TRO would be to entitle Tamanaco to appeal that order, which in fact it did. However, we see no reason why the technical and unintended status of the February 2 order as a preliminary injunction, if that is what it was, should bar the Commission from proceeding to present evidence at the plenary hearing on February 13, which all sides recognized as a preliminary injunction hearing. Tamanaco was served with notice of the February 13 hearing.

Nor, under these circumstances, should the appeal of the February 2 order, which may well have denied the District Court jurisdiction to alter that order, *see Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir.1962), preclude the District Court from issuing the February 14 preliminary injunction. Had we been asked, we surely would have remanded the appeal from the February 2 order to permit the District Court to amplify the record. Our disposition today of the appeal from the February 14 injunction in effect takes such action *nunc pro tunc* with respect to the February 2 order.

## IV. Sufficiency of the Evidence for Preliminary Injunctive Relief

The major issue on appeal is whether the evidence presented by the Commission sufficed to warrant a preliminary injunction. We begin our consideration of that issue with an examination of the pertinent statute and the standards that have evolved in applying it. Section 21(d) of the Exchange Act provides:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, [or rules of exchanges and other designated entities], it may in its discretion bring an action in the proper district court ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d) (1988).

The basic principles governing issuance of injunctions sought by the Government were set forth by the Supreme Court in *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). When Congress grants district courts jurisdiction to enjoin those violating or about to violate federal statutes, it is authorizing the exercise of "equity practice with a background of several hundred years of history." *Id.* at 329, 64 S.Ct. at 591. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Id.* Though ruling that courts retain discretion in the administration of injunction statutes worded in mandatory terms, *id.* 329–31, 64 S.Ct. at 591–92, the Court emphasized that "the standards of the public interest, not the requirements of private litigation, measure the propriety

and need for injunctive relief in these cases." *Id.* at 331, 64 S.Ct. at 592.

In our earliest encounters with injunction requests by the Commission, we relieved the Commission of the obligation, imposed on private litigants, to show risk of irreparable injury, *SEC v. Torr*, 87 F.2d 446, 450 (2d Cir.1937), or the unavailability of remedies at law, *SEC v. Jones*, 85 F.2d 17 (2d Cir.), *cert. denied*, 299 U.S. 581, 57 S.Ct. 46, 81 L.Ed. 428 (1936). That rule remains the law of this Circuit. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808-09 (2d Cir.1975).

Though the Commission faces a reduced burden in these respects, compared to private litigants, there is some uncertainty whether in other respects its burden in obtaining a preliminary injunction is the same as or greater than that of private litigants. The uncertainty concerns (1) whether the Commission's showing on the merits must be more than the "likelihood of success" standard required of private litigants, *see Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979), and (2) whether the alternative test for a preliminary injunction—irreparable harm plus an issue that is a fair ground for litigation and a balance of hardships that tips decidedly to the plaintiff, *id.*—is available to the Commission. The statutory standard set forth in section 21(d) of the Exchange Act—"a proper showing"—is singularly unenlightening in resolving these issues.

■ A. *Required Showing on the Merits.* Appellants contend that in this Circuit the Commission can secure a preliminary injunction only upon evidence that establishes a "strong *prima facie* case," a standard expressed in *SEC v. Management Dynamics, Inc.*, 515 F.2d at 807. The provenance of this somewhat odd formulation puts its authoritativeness in considerable doubt. The phrase first appeared in this Circuit's securities law jurisprudence in *SEC v. Boren*, 283 F.2d 312 (2d Cir.

1960). Rejecting a claim that the Commission was required to prove the duration of the defendants' involvement with a company that was the subject of enforcement proceedings, we said that it was "only necessary for the court to find that the petitioning agency had presented a strong prima facie case to justify the discretionary issuance of the interlocutory restraint." *Id.* at 313. Cited as authority were *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir.1953), and *Bowles v. Montgomery Ward & Co.*, 143 F.2d 38 (7th Cir.1944). Neither case involved a preliminary injunction sought by the SEC, and, more importantly, neither opinion used the phrase "strong prima facie case" nor purported to add to the traditional test for obtaining a preliminary injunction. *Hamilton Watch* was a private antitrust action in which we upheld a preliminary injunction on the *lenient* standard of a balance of hardships tipping decidedly to the plaintiff and a substantial question on the merits that is a fair ground for litigation. *Montgomery Ward* was a Government action to enforce wartime price control regulations in which the Seventh Circuit said that to obtain a preliminary injunction "[t]here need be only evidence tending to make out a prima facie case." 143 F.2d at 42. The adjective "strong" was not used nor implied in the opinion.

There matters stood until 1975 when *SEC v. Management Dynamics, Inc., supra*, was decided. Recounting the proceedings in the District Court, the opinion noted that the District Judge had found "the requisite 'strong prima facie case to justify the discretionary issuance of the interlocutory restraint,' *SEC v. Boren*, 283 F.2d 312, 313 (2d Cir.1960)." 515 F.2d at 807. Since *Boren* had rather casually used the formulation, citing as authority *Benrus Watch*, which had applied a more lenient standard, we are left to wonder what prompted the panel to characterize the "strong prima facie case" standard as "requisite."[4] In

---

**4.** In the one SEC preliminary injunction suit reaching this Court between *Boren* and *Management Dynamics*, we noted that the District Court had found the evidence sufficient to create "a strong *prima facie* case." *SEC v. S & P National Corp.*, 360 F.2d 741, 748 (2d Cir.1966). We upheld the finding as not clearly erroneous, but

any event, the panel was careful to leave open the prospect that more flexible standards would be appropriate in future cases where the fact of violation might not be as clear as in *SEC v. Management Dynamics, Inc.*, 515 F.2d at 809 n. 5. In such cases, a district court "will attach greater weight to traditional equitable principles," giving "special emphasis" to "the need to enforce the securities laws." *Id.*

Our next encounter with an SEC preliminary injunction was *SEC v. American Board of Trade, Inc.*, 751 F.2d 529 (2d Cir.1984), an opinion authored by Judge Friendly. He noted that the District Judge (as in the pending case, Judge Kram) had stated "quite correctly" that to obtain a preliminary injunction the SEC must demonstrate " '(a) a *prima facie* case that a violation of the securities laws has occurred, and (b) a strong likelihood that a violation will occur again in the future.' " *Id.* at 533 (quoting *SEC v. American Board of Trade, Inc.*, 593 F.Supp. 335, 338 (S.D.N.Y.1984)). The adjective "strong" was not applied to the phrase "*prima facie* case," and there is no indication that even this phrase was intended to impose a special burden more onerous than the traditional "likelihood of success" standard for preliminary injunctions.[5]

We find this history an insubstantial basis for concluding that the Commission's burden on the merits in obtaining a preliminary injunction is any greater than the traditional "likelihood of success" standard we have regularly applied to private litigants, and we see little virtue in enshrining the phrase "strong *prima facie* case" to serve along with the traditional standard. "*Prima facie* case" has a clear meaning: evidence of an amount and quality suffi-

cient to send a case to the trier of fact. Functionally, that standard does not serve well at the preliminary injunction stage, where the plaintiff, whether private litigant or Government agency, is usually seeking to preserve the status quo while completing discovery and preparing for a trial at which it will be required to present a *prima facie* case or suffer a directed verdict.[6] Adding the adjective "strong" only complicates matters further, introducing a qualitative assessment of uncertain meaning with no operational significance. We have never ruled in a preliminary injunction action that the SEC has presented a "*prima facie* case" but not a "strong *prima facie* case."

Since the SEC, in discharging its statutory responsibilities, is relieved of the burden of showing a risk of irreparable injury so that it may secure a preliminary injunction more easily than a private litigant, *cf. United States v. Siemens Corp.*, 621 F.2d 499, 505–06 (2d Cir.1980) (Government not required to show irreparable injury to obtain preliminary injunction in antitrust case), we should not add to its burden on the merits. What requires further consideration, however, is whether the traditional burden on the merits for a plaintiff seeking a preliminary injunction is only a probability of success or some more rigorous test. On this point, our position over the years has undergone a subtle change, one rarely noticed and perhaps not fully intended.

In 1907, we said:

It is a cardinal principle of equity jurisprudence that a preliminary injunction shall not issue in a doubtful case. Unless the court be convinced with *reasonable certainty* that the complainant must

did not indicate that the *prima facie* case was required to be "strong."

**5.** Judge Friendly also quoted Judge Kram as having found that the SEC had made "a strong prima facie case of prior violations and demonstrated a grave likelihood that violations will occur in the future." *Id.* at 534 (quoting 593 F.Supp. at 343). Since the test was stated "quite correctly" without the adjective "strong," the District Judge's use of the adjective to describe the Commission's showing does not make it part of the test.

**6.** It is not entirely clear that our use of the phrase "*prima facie* case" in the context of a preliminary injunction was ever intended to add rigor to the traditional "probability of success" standard. In *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), a private suit seeking a preliminary injunction for copyright infringement, we equated the quoted phrases. *Id.* at 94.

succeed at final hearing the writ should be denied.

*Hall Signal Co. v. General Ry. Signal Co.*, 153 F. 907, 908 (2d Cir.1907) (emphasis added). The "reasonable certainty" phrase from *Hall Signal* was quoted in the 1960s. *See Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc.*, 366 F.2d 373, 375 (2d Cir.1966); *Unicom Management Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966); *H.E. Fletcher Co. v. Rock of Ages Corp.*, 326 F.2d 13, 17 (2d Cir.1963). Other decisions in the 1960s used the phrase "clear showing" to modify the requirements of probable success and possible irreparable injury. *See Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 265 (2d Cir.1968); *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac*, 299 F.2d 33, 35 (2d Cir.1962).

In 1973, when our standards for a preliminary injunction were set forth in *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir.1973),[7] the *Sonesta* formulation was modified by the phrase "a clear showing," perhaps carrying forward the older qualifier "reasonable certainty." "Clear showing" was used to modify the *Sonesta* formulation in *Gresham v. Chambers*, 501 F.2d 687, 691 (2d Cir.1974), and *Diversified Mortgage Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir.1976) (citing *Checker Motors*, 405 F.2d at 323), but on occasion the *Sonesta* formulation was quoted without any qualifying phrase, *see, e.g., Jacobson &*

*Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 441 n. 2 (2d Cir.1977). *See also Halder v. Avis Rent–A–Car System, Inc.*, 541 F.2d 130, 131 (2d Cir.1976) (stating the test on the merits to be "a substantial likelihood of success"); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687 (2d Cir.1973) (stating that the question is whether it appears that the plaintiff "stands a strong chance of proving [the alleged statutory violation]," *id.* at 695, but setting forth preliminary injunction standard without any qualifying phrase, *id.* at 692).

Then in the late 1970s we revised the *Sonesta* formulation to make clear that possible irreparable injury was a requirement of all preliminary injunctions, including those obtained under the balance of hardships test. This refinement was articulated in *Triebwasser & Katz v. American Telephone & Telegraph Co.*,[8] 535 F.2d 1356, 1359 (2d Cir.1976), confirmed in *Selchow & Righter Co. v. McGraw–Hill Book Co.*, 580 F.2d 25, 27 (2d Cir.1978), and incorporated into a new formulation of the standard in *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir.1978).[9] None of these three opinions used the qualifier "clear showing" or any comparable phrase, nor did many opinions that subsequently quoted the *Caulfield* formulation, *e.g., Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir.1979); *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 359 (2d Cir.1979); *Jackson Dairy, Inc. v. H.P.*

---

**7.** "The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." 483 F.2d at 250.

**8.** The author of *Triebwasser* has minimized its significance, pointing out that *Sonesta,* properly read, always included irreparable injury as a component of the alternate "balance of hardships" test. *See* Mulligan, *Preliminary Injunction in the Second Circuit,* 43 B'klyn L.Rev. 831 (1977).

**9.** "This court has recently clarified the standard for issuance of a preliminary injunction: there must be a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." 583 F.2d at 610.

The previous year, we had used language virtually anticipating the *Caulfield* formulation, though purporting to rely on *Sonesta. See Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d at 94.

*Hood & Sons, Inc.,*[10] 596 F.2d 70, 72 (2d Cir.1979).

In the 1980s we tended to quote the *Caulfield* formulation as set forth in *Jackson Dairy,* and continued to omit any qualifying phrase. *See Deeper Life Christian Fellowship, Inc. v. Board of Education,* 852 F.2d 676, 679 (2d Cir.1988); *In re Feit & Drexler, Inc.,* 760 F.2d 406, 415 (2d Cir. 1985); *Kaplan v. Board of Education,* 759 F.2d 256, 259 (2d Cir.1985). We have observed that "certainty" is not required, *see Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985); *San Filippo v. United Brotherhood of Carpenters and Joiners,* 525 F.2d 508, 512 (2d Cir.1975), and that, with respect to the merits, the plaintiff "need only make a showing that the probability of his prevailing is better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d at 1025.

Though the "clear showing" qualifier appears to have been abandoned for injunctions that serve the traditional purpose of preserving the status quo, plaintiffs have been put to a more rigorous burden in obtaining preliminary injunctions that order some form of mandatory relief. We have said that a "clear showing" is required where the injunction is mandatory. *Abdul Wali v. Coughlin,* 754 F.2d at 1025. *See also Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d at 441 (recognizing higher standard for mandatory injunction). Thus, even when applying the traditional standard of "likelihood of success," a district court, exercising its equitable discretion, should bear in mind the nature of the preliminary relief the Commission is seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo. Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it

seeks. In some cases a preliminary injunction can have very serious consequences, *see SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 99 (2d Cir.1978); *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 55 (2d Cir.1976), yet in other cases may be fairly described as only a " 'mild prophylactic,' " *see SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 193, 84 S.Ct. 275, 283–84, 11 L.Ed.2d 237 (1963) (quoting with approval from *SEC v. Capital Gains Research Bureau, Inc.,* 306 F.2d 606, 613 (2d Cir.1962) (in banc) (dissenting opinion)).

■ B. *"Serious Questions on the Merits" Test.* The Commission urges that it is entitled to obtain a preliminary injunction under section 21(d) on the alternative test, available to private litigants, of irreparable injury plus both sufficiently serious questions going to the merits and a balance of hardships tipping decidedly to the party requesting preliminary relief. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d at 72. However, in the analogous context of a statutory preliminary injunction sought by the Government to enforce the antitrust laws, we have ruled that the "serious questions on the merits" test is not available. *See United States v. Siemens Corp.,* 621 F.2d at 505–06. The rationale of this ruling was that the Government, in seeking a statutory preliminary injunction, is entitled to a presumption of irreparable injury upon a showing of a reasonable probability of a law violation and that a showing of only serious questions on the merits is insufficient to warrant such a presumption. *Id.* at 506. That is not an entirely satisfactory explanation, since the Government, in urging the alternative test, may wish to shoulder the burden of proving one of its components, irreparable injury, unaided by the presumption of such injury that is available upon a showing of likelihood of success on the merits. Perhaps the alternative test has been denied the Government in recognition of the fact that the United States and its

---

**10.** *Jackson Dairy* may have hastened the departure of the "clear showing" qualifier by stating that the standard in the Second Circuit for injunctive relief "clearly calls for a showing of [the *Caulfield* formulation], 596 F.2d at 72, instead of saying "calls for a clear showing of [the *Caulfield* formulation]." Whether the shift from "clear showing" to "clearly calls for a showing" was deliberate or inadvertent is, in a word, unclear.

agencies are relieved of the obligation imposed on private litigants to provide security for damages incurred by a party wrongfully enjoined, *see* Fed.R.Civ.P. 65(c), and are protected by sovereign immunity, thereby leaving a party without recourse if wrongfully enjoined on a showing of only significant issues going to the merits.

In any event, we have never applied the "serious questions on the merits" test to a preliminary injunction sought by the Commission or, for that matter, by any governmental agency, and we are not disposed to do so now. In practice, the absence of the alternative test as an articulated standard may not have much significance, since, as we have indicated, the degree to which the Commission must show likelihood of success will be reduced where the interim relief sought is not especially onerous.

C. *Application of Preliminary Injunction Standards.* Having labored so extensively to identify the relevant standard for assessing the sufficiency of the Commission's evidence, we find its application to the facts of this case an easier task. Since the test of sufficiency varies with the nature of the relief sought, we consider separately each of the two principal forms of relief that were ordered—the prohibition against future insider trading violations and the freeze order.[11]

■ (i). *Prohibition Against Future Securities Law Violations.* The prohibition against future securities law violations is among the sanctions that we have characterized as having grave consequences. Such an order subjects the defendant to contempt sanctions if its subsequent trading is deemed unlawful and also has serious collateral effects. *See* André, *The Collateral Consequences of SEC Injunctive Relief: Mild Prophylactic or Perpetual Hazard?*, [1981] Ill.L.Rev. 625. Though the order is prohibitory in form, rather than mandatory, it accomplishes signifi-

cantly more than preservation of the status quo. For this form of relief, the Commission has to make a substantial showing of likelihood of success as to both a current violation and the risk of repetition. An insider trading violation requires proof not only that the defendant traded on the basis of material nonpublic information but also that in doing so he knew or should have known that he was breaching a fiduciary duty. *See Dirks v. SEC*, 463 U.S. 646, 660, 103 S.Ct. 3255, 3264, 77 L.Ed.2d 911 (1983); *Chiarella v. United States*, 445 U.S. 222, 230–32, 100 S.Ct. 1108, 1115–17, 63 L.Ed.2d 348 (1980).

In this case, the Commission has not identified the person or entity alleged to have conveyed inside information to either appellant. It is therefore more difficult than in the typical tipping case to determine whether, even if the appellants obtained inside information, they traded upon it in breach of a fiduciary duty that they knew or should have known existed.[12] Though a "tippee's duty to disclose or abstain is derivative from that of the insider's duty," *Dirks v. SEC*, 463 U.S. at 659, 103 S.Ct. at 3264, we do not know from whom such a duty might derive in this case.

The Commission attempts to bridge this fundamental gap in its evidence with speculation. Even if we assume that it has sufficiently shown an adequate probability that Candid Peyer, Espirito Santo's broker at Raymond Jones, had material nonpublic information from an insider, we are then asked to infer the requisite relationship to Unifund and Tamanaco from wholly inadequate circumstances. The evidence showed that Unifund's principal is related, familially and financially, to a bank that bought Rorer securities through Raymond Jones. The link to Unifund assumes that Peyer's information was conveyed to Raymond Jones, then to Bank Audi, and then to

---

11. Appellants make no separate challenge to the provision of the preliminary injunction prohibiting disposal or alteration of their books and records, apparently acknowledging that if any relief is warranted, this innocuous provision should not be disturbed.

12. We need not decide at this stage of the litigation whether the requisite breach of fiduciary duty (of which the tippee was or should have been aware) can be established without identification of either the tippee's immediate tipper or the insider who first disclosed the nonpublic information to those relaying it to the tippee.

Unifund, under circumstances where Unifund knew or should have known of a nondisclosure obligation. These assumptions are unsupported on this record. Nor are they provided by the commonality of surnames between an officer of Bank Audi and a shareholder of Unifund (both named Karam), or between an executive of Rhone and an incorporator of Unifund (both named Khoury).

The linkage is no better with respect to Tamanaco. It assumes that Peyer's information was conveyed to Raymond Jones, then to Espirito Santo, and then to Tamanaco. These assumptions are also unsupported.

What the record discloses is unusual trading by both Unifund and Tamanaco on the eve of the merger announcement. They may well have had inside information, but possession of such information without more does not give rise to a duty to disclose or abstain from trading, *Dirks v. SEC, supra,* at least where the recipient of the information is an ordinary investor. Whatever adverse inferences might be drawn from the recalcitrance to discovery that Judge Kram attributed to appellants are not sufficient to remedy the gap in the Commission's showing of a probable insider trading violation.

■ (ii). *Freeze Order.* We reach a different conclusion with respect to the freeze order, though we modify the terms of the order. In seeking to freeze appellants' accounts, the Commission is requesting ancillary relief to facilitate enforcement of any disgorgement remedy that might be ordered in the event a violation is established at trial. Unlike the injunction against securities law violations, the freeze order does not place appellants at risk of contempt in all future securities transactions. It simply assures that any funds that may become due can be collected. The order functions like an attachment. That does not mean, however, that its issuance must be tested against state law standards, as would be the case if the relief were sought pursuant to rule 64 of the Federal Rules of Civil Procedure. Congress has authorized the Commission to obtain preliminary injunctive relief upon a "proper showing," and it is a matter of federal law whether the showing the Commission has made is sufficient to support an interlocutory freeze order. *Cf. FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1112 (9th Cir.1982) (unavailability of attachment does not preclude other provisional remedies). Moreover, an ancillary remedy may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established, *see SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d at 103 n. 13 (approving disgorgement remedy despite failure to show likelihood of recurring violation), and such a remedy is especially warranted where it is sought *for a limited duration, see SEC v. Levine,* 881 F.2d 1165, 1177 (2d Cir.1989).

Though the Commission has not presented at this stage sufficient evidence to warrant a preliminary injunction of traditional scope, its evidence suffices to warrant some form of freeze order. There is a basis to infer that the appellants traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.

Three aspects of the freeze order in this case require further consideration. First, the order freezes funds in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty, equal to three times the profits, that the Commission may recover under section 21A of the Exchange Act upon proof of a violation. *See* 15 U.S.C. § 78u–1 (1988). Appellants challenge this aspect of the order, relying on *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir. 1972), where we said that a freeze order could be imposed so long as it orders " 'remedial relief and is not a penalty assessment.' " *Id.* at 1104 (quoting *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct.

561, 30 L.Ed.2d 558 (1971)). That observation was made in setting aside that portion of an order requiring surrender of the income earned on proceeds required to be disgorged. Though recognizing that surrendering the earned income might add to the deterrent effect of securities law enforcement, we concluded that this incremental remedy would be arbitrary in the circumstances presented. *Id.*

With the enactment of section 21A in 1988 [13], Congress has made the judgment that a civil penalty equal to three times the profits of insider trading should be an available remedy for the Commission. Our reluctance in *Manor Nursing Centers* to permit a freeze order to reach funds not normally forfeitable is not authority for denying the Commission the opportunity to collect funds that Congress has expressly determined are appropriate for forfeiture. *See United States v. First National City Bank*, 379 U.S. 378, 385, 85 S.Ct. 528, 532, 13 L.Ed.2d 365 (1965) (preliminary injunction preventing dissipation of assets to secure Internal Revenue Service jeopardy assessment); *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 220, 65 S.Ct. 1130, 1134, 89 L.Ed. 1566 (1945) (indicating approval of freeze order to protect availability of relief "of the same character as that which may be granted finally").

Second, and more troublesome, is the fact that the freeze order obliges appellants not merely to maintain in their accounts funds sufficient to pay the amounts that might eventually be due but also to refrain from any trading in the accounts without the Commission's approval. The Commission understandably prefers such a remedy, which enables it to insist upon high-grade investments to maximize the prospect that sufficient funds will be available in the accounts to pay the civil penalties. But bearing in mind the basic principle that burdensome forms of interim relief require correspondingly substantial justification, we conclude that the Commission's

showing in this case is inadequate to support the extensive trading restriction in the freeze order. The Commission has presented a thin case for *any* ancillary relief. At most, its meager showing entitles it to an order that provides reasonable security for collecting a judgment, with a trading restriction imposed only if that security becomes deficient. The freeze order should be modified to provide that the appellants shall maintain in their accounts funds and securities in an amount equal to three times the profits earned on the Rorer trades, with the proviso that, should either appellant's account balance, at fair market values, decrease to a level at or below twice that appellant's Rorer profits, that appellant must restore the account to a level equal to three times its Rorer profits, failing which the Commission may reimpose its restriction on permissible trading. Though this modified remedy tolerates a risk that unsuccessful trading might erode some of the value of the accounts from which the Commission hopes to collect any penalties that may be assessed, it gives the Commission substantial security without unduly burdening the appellants by denying them the opportunity to invest as they see fit. Presumably, they are as anxious to see their account balances grow as is the Commission, though we acknowledge that the appellants will now have the opportunity to make their more risky investments from the accounts previously frozen so extensively. In any event, we are satisfied that this mild thaw in the freeze order appropriately adjusts it to the maximum interim relief to which the Commission is entitled in view of its minimal showing of a violation.

Third, though we are willing to approve a modified freeze order, we do not believe that the Commission is entitled to keep even the modified order in force for whatever period of time the Commission may take to prepare for trial. In view of the Commission's meager showing on the mer-

---

**13.** In 1984 Congress first authorized the Commission to seek a penalty equal to three times the profit from insider trading. *See* Insider Trading Sanctions Act of 1984, § 2, Pub.L. No. 98–376, 98 Stat. 1264 (1984). This authority was augmented by enactment of the Insider Trading and Securities Fraud Enforcement Act of 1988, § 3(a)(2), Pub.L. No. 100–704, 102 Stat. 4677 (1988).

its, it should not be entitled to interfere with the appellants' unrestricted use of their accounts for more than a brief interval. In view of the time that has already elapsed since the injunction issued, we will direct that the freeze order, as modified, shall terminate thirty days after the issuance of our mandate, unless within such time the Commission advises the District Court of its readiness for immediate trial.

The orders of the District Court are vacated in part and modified in part, and the cause is remanded for entry of orders revised in conformity with this opinion.